[No. 31074. *En Banc.* September 15, 1950.]

THE STATE OF WASHINGTON, *Respondent,* v. ROBERT D. YOAKUM, *Appellant.*[1]

[1] Reported in 222 P. (2d) 181.

*Don G. Abel*, for appellant.

*D. J. Cunningham* and *J. H. Jahnke*, for respondent.

SCHWELLENBACH, J.—This is an appeal from a judgment and sentence after a verdict of the jury finding the defendant guilty of second degree assault.

July 17, 1948, Robert D. Yoakum and Charles Epling had an altercation in Centralia, with the result that Epling received knife wounds administered by Yoakum. Epling was taken to the hospital and Yoakum disappeared. The following night he was apprehended at the home of his sister. He gave the officers the knife used in the fight and was taken to the police station. Sheriff Thayer and Chief of Police Otto Rucker questioned him for about an hour and a half, using a wire recording machine to record the interview. At the trial they testified generally as to statements made by the defendant at that inquiry. Sheriff Thayer was questioned as follows:

"Q. Have you preserved that record? A. I have. Q. Have you played the record since? A. I have. Q. I will ask you whether or not from your recollection of the conversation whether that is a correct record of what was said and done at the time? A. I would say it is a fair representation of the conversation that took place at that time."

In his own behalf defendant Yoakum testified to having done considerable drinking during the day and evening of July 17th; that he had parked his car on Railroad avenue behind the Olympic Club; that he remembered fighting with Epling at the Club Tavern; that Epling had him by the throat and was bending him back over a pinball machine when his friend, Foy Moore, broke up the fight and shoved him out of the door; that he went down an alley to get to his car and go home; that he had lost his car keys and had been using a pen knife to open a window; that, upon reaching his car, he opened his knife preparatory to opening the window, when he was "jumped" by Epling, who grabbed him by the throat and shoved him back against the car; that he tried to throw Epling off and did not realize that he had

cut him until he heard Epling tell Moore that he had been cut.

During the cross-examination, the deputy prosecutor referred to some ten pages of typewritten material which was apparently a transcription of the conversation heard on the wire recording machine. We find it necessary to quote certain excerpts from the cross-examination.

The defendant was asked whether he had said anything at the police station about having lost the keys to the car and that he was trying to open the car with his knife, to which he answered that he did not remember what he had said. The prosecutor then asked:

"Q. I want to ask you whether at the time you gave your *testimony* before the wire recorder in response to —" (Italics ours.)

Objection was then made that this was not testimony, and the following occurred:

"THE COURT: It is not testimony. Testimony is sworn testimony, the way you lawyers understand it. MR. JAHNKE: Yes. I am asking him whether he at that time made any prior inconsistent statements. MR. JAHNKE: Q. Now at that time, in response to a question asked by Otto Rucker, I want to ask you if at the time he asked this question you made the following answer: 'Didn't you meet him' speaking of Epling 'just out in front of the Olympic Club there? Didn't you talk to him there when I was standing there with you?' And didn't you say, 'I don't think so. I didn't recognize him.' Did you make that statement? A. I don't know whether I did or not."

Later, objection was made that the prosecutor had no right to misquote the testimony and the following occurred:

"MR. JAHNKE: *I am quoting it just like it appears on this record.* MR. JAHNKE: Q. Now I want to ask you if at that time, in response to this question that Otto Rucker asked you, whether or not you made this statement: 'Didn't he say' referring to Epling, 'there in front of the Olympic Club, "Red, do you remember me?" And you said Yes, you looked at him and said you did but hadn't seen him for quite a while. Do you remember that?' And you answered, 'No.' Was that your answer?" (Italics ours.)

"Q. I want to ask you whether in response to this question asked by Otto Rucker, you made this statement: 'How did you have time if he grabbed you when you got behind the Olympic Club to get your knife and open it?' You said, 'I don't know.' Did you make that statement? A. I don't know.

---

"Q. *I believe you testified before the wire recorder* they were in there at the time you had this altercation with Epling." (Italics ours.)

---

"Q. I want to ask you this, whether in response to a question that Otto Rucker put to you at that time, you made this answer, — *and this is the question*: 'Now, why did you use a knife?' And you answered: 'Well, when we got one fight broken up there was no use to continue getting in another one. I don't know what this thing is all about to start with.' *And the next question was*: 'Well, I know, but you didn't have to use a knife on him, you might kill him, might kill a man, did you stop to think about that when you used the knife on him?' And did you make this answer: 'First time I ever used one. Drunk I guess.' Now was that your answer?" (Italics ours.)

---

"Q. . . . I want to ask you this, in response to a question that was asked you by Otto Rucker — *I will have to go back a little ways*. Were you asked this question: 'How far down Tower Avenue did you go, Red?' And did you answer to that question: 'Well, I must have gone as far as Maple if that is what that street is.' Did you say that? A. I don't know. Q. Then the next question: 'South on Tower Avenue?' And did you say: 'No, north.' A. I don't know. Q. *You seemed to be pretty clear about directions at that time.* The next question: 'Well, this is Maple out here, by the city hall.' And did you answer: 'Well, it is the street going across here.' Did you make that answer? A. I don't know. Q. The next question: 'Yes, that is Maple, and that is where you were, down Tower Avenue to Maple Street, is that right?' And I will ask you now whether you made this answer: 'I don't know. I went across Maple Street and went over to the pole yard. I fell down over there. I was pretty well steamed up, the excitement didn't help any.' Did you make that statement? A. I don't deny it or confirm it." (Italics ours.)

---

"Q. . . . Now, then, *as interrogated here in this statement,* if that was your answer at the time, you say you don't know why you stuck him with a knife, is that your testimony now?" (Italics ours.)

No testimony was produced by the state in rebuttal concerning any of the alleged questions and answers referred to by the deputy prosecutor during his cross-examination.

In *Thurmond v. State,* 57 Okla. Crim. 388, 48 P. (2d) 845, the court said:

"A careful examination of the record presents a peculiar effort upon the part of the prosecuting attorney not followed up by testimony, showing conclusively that it was the desire and ambition of the prosecuting officer to try, if possible, to impress upon the jury the fact that the witnesses were not telling the truth. In one or two instances, a witness who was not testifying apparently to the satisfaction of the prosecuting officer was asked, 'Didn't you tell me the car was going sixty miles per hour?' and the witness answered 'No.' Several other witnesses were asked similar questions and answered they had not made such statements to the prosecuting officer. Many others were asked if they had ever reported to any one they had seen the accident, and when they stated they had not, then the prosecuting officer would go into questions as to statements they had made contrary to what they testified to. In each of these instances the testimony was closed, and no effort was made by the state's attorney to show that the witness had made the statements to him or other parties inquired about, thus leaving the question before the jury that in the mind of the county prosecutor the witness had made the statements inquired of, without any testimony except the questions of the county prosecutor. This kind of procedure cannot be approved by this court. When the county prosecutor interrogates a witness as to conflicting statements made to him, or to other witnesses, if the witness denies the fact, the county prosecutor should be in a position to offer proof upon those questions; otherwise the questions should not be asked."

In *Hash v. State,* 48 Ariz. 43, 59 P. (2d) 305, in a prosecution for statutory rape, the county attorney asked the following questions during his cross-examination of J. A. Edgar, father of the prosecuting witness:

"Q. Let me finish my question. I will ask you if you didn't come up to my office and in the presence of Ed Frazier a few days after the date on which the preliminary hearing was set, that is the time for the hearing, not when it was set, but a few days after the time it was set for preliminary hearing, you came up there and asked me to dismiss that case that involved your daughter, and I asked you why, and you said, 'I don't know whether he had intercourse with her or not, but if he did, he didn't get it into her womb and she is not going to be hurt by it.' Didn't you do that? A. No, sir.

"Q. And didn't I at that time say to you, 'Mr. Edgar, do you mean to say that just because your daughter,' using your own language, 'That he didn't get it into her womb he shouldn't be prosecuted'? A. Absolutely not.

"Q. And didn't I say to you at that time and place in the presence of Ed Frazier that if you didn't have any respect for your own daughter you ought to have it for any other girls that might be involved in this case? A. No, sir."

A motion to strike the questions and answers was denied by the trial court, stating: "It may be for use as a basis for impeachment." No witness was later placed on the stand to support the impeaching questions. In granting a new trial the Arizona court said:

"It can at once be seen that these questions must have been damaging to the defendant. Back of each was the personal guarantee of the county attorney that Edgar had stated to him all the things assumed in the question. In other words, it was as though the county attorney had himself sworn and testified to such facts. Not only was his personal and official standing back of these statements, but he called in to corroborate him Ed Frazier, deputy county attorney, a lawyer of high standing for integrity and ability. These questions were not put, as the court assumed 'as a basis for impeachment.' Their certain effect was to discredit the witness J. A. Edgar. The county attorney, if he knows any facts, may, like any other witness, be sworn and submit himself to examination and cross-examination, but he may not obtrude upon the jury and into the case knowledge that he may possess under the guise of cross-examination, as in this case.

"To give sanction to the manner in which the prosecution conducted the cross-examination of defendant's witness J. A. Edgar would establish a precedent so dangerous to

fair trials and the liberties of our citizens that we feel for that reason alone the case should be retried."

*Philadelphia & R. Ry. Co. v. Bartsch,* 9 F. (2d) 858, was an action by the widow against the railroad company for damages sustained arising from her husband's death. At the trial one Huber, a witness for the defendant, testified as to the effect of a stop such as that made by the train in question. On cross-examination counsel for the plaintiff held in his hand what purported to be a statement signed by the witness, and asked him whether or not he had given it to one Wolburn. This the witness denied. The court reversed the judgment, and in discussing this procedure and its effect, said:

"Instead of showing the paper to the witness, and asking him whether the signature it contained was his, and, in the event of denial, having the paper marked for identification and use in contradiction, counsel proceeded, over objection, to read to the witness the whole of the statement, paragraph by paragraph, in the form of questions. All of which the witness denied. The case ended without Wolburn being called to verify the writing and without Huber being otherwise contradicted. The substance of the statement, as indicated by the questions into which it was split up, was quite the opposite of the testimony the witness had given in his direct examination, and, therefore, it was very prejudicial to the defendant. By contradicting the witness in this fashion the plaintiff got into the record and before the jury matter which was not evidence at all. Its admission, we are constrained to find, was error."

See, also, *Jones v. Commonwealth,* 191 Ky. 485, 231 S. W. 31; *State v. Copenbarger,* 52 Idaho 441, 16 P. (2d) 383; *State v. Jones,* 48 Mont. 505, 139 Pac. 441.

In the case at bar the questions asked could have been for the purpose of laying the foundation for impeachment; however, they were not followed by rebuttal testimony. As part of the state's case in chief Sheriff Thayer was asked and he testified that the record, as taken by the wire recording machine, was a fair representation of the conversation that took place. This had the effect of giving verity to the typewritten sheets later used in cross-examination. The deputy

prosecutor continued to refer to the appellant's "testimony" before the wire recorder. At one time during his cross-examination he stated, "I will have to go back a little ways," making it clear that he was reading from the transcribed notes. He did not ask the appellant whether or not certain specific questions were asked of him. He told him, saying, "and this is the question."

 A person being tried on a criminal charge can be convicted only by evidence, not by innuendo. The effect of the cross-examination as conducted by the deputy prosecutor was to place before the jury, *as evidence*, certain questions and answers purportedly given in the office of the chief of police, without the sworn testimony of any witness. This procedure, followed with such persistence and apparent show of authenticity, was prejudicial to the rights of appellant.

The judgment and sentence is reversed and remanded with directions to grant appellant a new trial.

SIMPSON, C. J., BEALS, ROBINSON, HILL, GRADY, HAMLEY, and DONWORTH, JJ., concur.

MALLERY, J., dissents.