[No. 11701-4-III.   Division Three.   January 12, 1993.]

THE STATE OF WASHINGTON, *Respondent*, v. CULLENE FRANCIS BABICH, *Appellant*.

*Charles S. Dorn* and *Brian O'Brien*, for appellant.

*Michael E. McNeff, Prosecuting Attorney*, and *Joe J. Solseng, Deputy*, for respondent.

THOMPSON, J. — Cullene F. Babich appeals her jury convictions for possession of marijuana and delivery of marijuana and cocaine to a police informant. She contends she was denied a fair trial by the prosecutor's improper impeachment of defense witnesses. We reverse her conviction for delivery of cocaine, but affirm the remaining convictions.

Gary Townsend and his wife, Marjorie, are paid police informants. He testified that on January 29, 1990, Sherry Vanzile telephoned him and told him she had someone at her house who had marijuana for sale. He went to Ms. Vanzile's home and purchased marijuana from Cullene Babich.

On March 28, 1990, Mr. Townsend was in the Pub Tavern in Oroville. He and his wife were drinking with Ms. Babich and Kevin Bartell. The Townsends invited Ms. Babich and Mr. Bartell to their house where they continued drinking. Mr. Townsend testified he asked Ms. Babich if she could get cocaine for him. She told him she could get him an ounce. The next morning he called her at the telephone number she had given him the night before and advised her he had $350 for a quarter ounce. Kevin Bartell went to the Townsends' house, picked up $300 from Mr. Townsend and returned later with the cocaine. Mr. Townsend stated he gave Mr. Bartell a ride to the Pub Tavern where he delivered the remaining $50 to Ms. Babich personally.

During direct examination, the prosecutor asked Mr. Townsend if he used drugs while working as an informant and whether he was tested for drug use during this time period. He stated he had not used drugs since 1988 and that he had been subjected to several urinalyses and blood tests. The prosecutor then asked if he knew the results of the tests. Defense counsel objected to the latter question on the basis of hearsay, but the court allowed Mr. Townsend to answer, ruling, "[t]he question was does he know". However, Mr. Townsend answered all the tests were returned negative for drug use. The prosecutor had previously asked Officer John Scott Alden of the Okanogan Sheriff's office, also over defense objection,

about whether Mr. Townsend had been tested and if he remembered the results, and received the same response.

Agent Alvin Bauman of the United States Border Patrol testified he was the law enforcement officer who worked with Mr. Townsend on both the January marijuana buy and the March cocaine buy. He later executed a warrant to search Ms. Babich's residence and found marijuana.

In the defense case, Ms. Babich admitted both of the deliveries to Mr. Townsend. However, she stated a friend gave her the marijuana. She did not know beforehand that Ms. Vanzile had arranged for Mr. Townsend to purchase it. When she went to Ms. Vanzile's house, her intent was to make a little money by selling it to Ms. Vanzile, whom she knew.

Ms. Babich's version of the March cocaine delivery raised the defense of entrapment. Ms. Babich stated she was drinking in the Pub Tavern with Mr. Bartell when Mr. and Mrs. Townsend sat down with them and started buying them beers. After they went to the Townsends' residence, Mr. Townsend passed around a marijuana joint, which they all smoked. Mr. Townsend told her he had been looking for cocaine. She responded that she did not know anything about it. Mr. Townsend then passed around some cocaine. He continued to pressure her about getting him more of the drug.

Ms. Babich stated that at some point during the evening she "broke down" and told Mr. Townsend she might know someone who could help him and that she would check on it in the morning. He called her twice before noon the next day. She was reluctant to go through with the deal, but Mr. Bartell told her that if she would get the cocaine, he would take it to Mr. Townsend. She next saw Mr. Townsend in the Pub Tavern when he dropped Mr. Bartell off there. He placed $50 in front of her, said "Here's for doing that cocaine deal", and left before she could respond. Ms. Babich refused to say from whom she obtained the cocaine. The inference raised at trial was that she got the cocaine from her brother.[1]

---

[1]Based on Ms. Babich's testimony, the court instructed the jury:

"Entrapment is a defense to a criminal charge if the criminal design originated in the mind of law enforcement officials, or any person acting under their

Other witnesses also testified that in their dealings with Mr. Townsend it was his habit to use drugs and alcohol with them prior to proposing they sell him drugs.[2] One of these people, Ernesto Franco, stated on cross examination he did not know Ms. Babich dealt drugs and he never said he bought drugs from her. The prosecutor then questioned Mr. Franco about a conversation he had with Gary Townsend on May 30, 1990, which Mr. Townsend allegedly recorded using a body wire. This cross examination included the following:

> Q: *And then, and you said,* "Well, we should go talk to her [Ms. Babich], and then she can call her brother." Do you remember that?
>
> . . . .
>
> A: Okay. I remember.
>
> . . . .
>
> Q: And so, you used to — You knew that she was a drug dealer?
> A: No.
>
> . . . .
>
> Q: All right. You don't remember saying that — You don't remember discussing buying ounces from her [Ms. Babich], or anything like that?
> A: No.
> Q: And, talking to her, "Well, if she can't do it, then her brother can do it," stuff like that?
> A: No.
> Q: You don't remember that?
> A: It's not that I don't remember. That's a "no." I never said that she was going to buy — sell me some ounces.
> Q: Okay. Well, I mean, do you remember saying "Cullene, she was dealing, she was dealing in halves and eighths, and shit, I wish I could get some?"
> A: Not really.
> Q: Okay. *Well, see, here, it says, "EF;" that's "Ernie Franco." That's you, right? And that's what this says, right? Right? "She was dealing. She was dealing in halves and eighths."*
> A: That's what that says.
>
> . . . .

---

direction, and the defendant was lured or induced to commit a crime which the defendant had not otherwise intended to commit.

"The defense is not established if the law enforcement officials did no more than afford the defendant an opportunity to commit a crime."

[2]These witnesses were incarcerated at the time of trial on drug convictions stemming from Mr. Townsend's work as an informant.

Q: *And then you say,* "Her [Ms. Babich's] brother, her brother is one of the oldest motherfuckers that sells coke here. But he does to Canadian people, and what he does, he cuts the son of a bitch in half."

"I never wanted to deal with him," *you say*; "I never did." Do you remember saying this? "And he doesn't trust me. I don't trust him, because he knows that I know what he does. Cullene trusts me, and she even paid me stuff — from me."

"Why didn't she get it from her brother?" "Because she knew that her brother was fucking stepping on it." What does "stepping on it," mean? What is to "step on" drugs?

A: To cut it.

. . . .

Q: *And then you said,* later on, "So Cullene, instead of buying from her brother, . . ." and then it breaks off. Do you remember that statement?

A: No.

(Italics ours.)

Michaelyn Maldonado, the Townsends' neighbor, testified on cross examination:

Q: Do you remember having a conversation on May 30, of 1990 with Gary Townsend in which you told him, when he came to you about some cocaine, that what he needed to do was to deal with the defendant because she had had a new shipment come in? Do you remember that conversation?

A: No, I don't remember it as being — That's not the way the conversation went. He came to me, and he asked me if I would provide him with a connection, and that he very much wanted to connect, for some reason, with Cullene, to purchase drugs.

The State did not introduce extrinsic evidence to prove Mr. Franco or Ms. Maldonado said Ms. Babich dealt in cocaine. Nevertheless, the prosecutor argued during closing:

You also have the testimony from Michaelyn Maldonado [the Townsends' neighbor] that during a body wire she· didn't know about, she told the Townsends that if they wanted to get rid of a new supply of cocaine that they were getting in, that the person they needed to talk to was the defendant, because she had buyers for cocaine.

You also have evidence of predisposition because Ernie Franco was quoted on a body wire. And, you have to remember, these people didn't know this body wire was out there. *Ernie Franco said, on the body wire, that the defendant dealt*

*in halves and eighths. . . . She was known to other cocaine dealers as a cocaine dealer.*

(Italics ours.)

The jury rejected Ms. Babich's entrapment defense and found her guilty on all charges.

First, Ms. Babich contends her due process right to a fair trial was violated by the prosecutor's use of the prior statements allegedly made by the witnesses to the informant.

■ Traditional practice in Washington allows admission of a witness' prior inconsistent statement for impeachment purposes. 5A K. Tegland, Wash. Prac., *Evidence* § 254(1), at 298 (3d ed. 1989).[3] Proper impeachment by prior inconsistent statement utilizes a procedure in which the cross examiner first asks the witness whether he made the prior statement. If the witness admits the prior statement, extrinsic evidence of the statement is not allowed because such evidence "would waste time and would be of little additional value". 5A K. Tegland § 258(2), at 315. If the witness denies the prior statement, extrinsic evidence of the statement is admissible unless it concerns a collateral matter. In fact, as Professor Tegland points out, it may be error for the prosecutor *not* to introduce extrinsic evidence.

> [I]f foundation questions are asked and the witness denies making the inconsistent statement, there may be error under particular circumstances if the cross-examiner *does not* later introduce extrinsic evidence of the statement. If the rule were otherwise, *cross-examination could be abused by making insinuations about statements that the witness did not in fact make,*

---

[3] ER 613 is a partial codification of this practice. The rule provides:

"**(a) Examining Witness Concerning Prior Statement.** In the examination of a witness concerning a prior statement made by the witness, whether written or not, the court may require that the statement be shown or its contents disclosed to the witness at that time, and on request the same shall be shown or disclosed to opposing counsel.

"**(b) Extrinsic Evidence of Prior Inconsistent Statement of Witness.** Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in rule 801(d)(2)."

*and the jury could be misled into thinking that the statements allegedly attributable to the witness were evidence.*

(Footnotes omitted. Some italics ours.) 5A K. Tegland, at 316.

In *State v. Yoakum*, 37 Wn.2d 137, 222 P.2d 181 (1950), during cross examination the prosecutor quoted extensively from a transcript of a taped interview of the defendant conducted by law enforcement officers. When the prosecutor asked the defendant if he had made those statements, the defendant answered, "I don't know". *Yoakum*, at 140. The State did not produce any extrinsic evidence concerning the alleged questions and answers referred to by the prosecutor. *Yoakum*, at 141. The court held this procedure left the jury with the impression "that in the mind of the county prosecutor the witness had made the statements inquired of, without any testimony except the questions of the county prosecutor". *Yoakum*, at 141 (quoting *Thurmond v. State*, 57 Okla. Crim. 388, 48 P.2d 845 (1935)). It reversed the defendant's conviction, reasoning:

> A person being tried on a criminal charge can be convicted only by evidence, not by innuendo. The effect of the cross-examination as conducted by the deputy prosecutor was to place before the jury, *as evidence*, certain questions and answers purportedly given in the office of the chief of police, without the sworn testimony of any witness. This procedure, followed with such persistence and apparent show of authenticity, was prejudicial to the rights of appellant.

*Yoakum*, at 144.

Cases from other jurisdictions also set forth the rule that "the duty to follow up foundation with evidence is breached at the risk of reversal of any tainted victory." *United States v. Bohle*, 445 F.2d 54, 74 (7th Cir. 1971). "[A] prosecutor may not use impeachment as a guise for submitting to the jury substantive evidence that is otherwise unavailable"; "a prosecutor who asks the accused a question that implies the existence of a prejudicial fact must be prepared to prove that fact". *United States v. Silverstein*, 737 F.2d 864, 868 (10th Cir. 1984).

In *Silverstein*, at 868, the prosecutor knew he could not prove by independent evidence the substance of an alleged

conversation between one Malone and the defendant because Malone had escaped from prison before trial. *Scott v. State*, 446 So. 2d 580 (Miss. 1984) held the prosecutor's attempt to impeach the witness by use of her grand jury testimony was improper. No transcript of that testimony was ever introduced. *Scott* held at pages 584-85:

> Without a transcript of the proceedings the only rebuttal to the district attorney's line of questioning becomes the witness' denial. This carries with it . . . inherent prejudice[]. . . . [T]he jury is far more likely to believe that the witness did indeed make those statements before the grand jury simply because the district attorney is insistent that she did. The district attorney then becomes a witness against the defendant.

*State v. Amos*, 490 S.W.2d 328, 331 (Mo. Ct. App. 1972) reversed a conviction because the prosecutor, in cross-examining the defendant about whether he had been convicted of prior crimes, made a show of consulting an offense record, then failed to produce evidence the defendant had been convicted of a prior offense. The court reasoned at page 331:

> The prosecutor offered no evidence to rebut the defendant's denial that he had been convicted of that offense. Rather, he undertook a persistent inquiry into other identities and aliases the defendant may have assumed, and those which defendant had denied having used were tied to him by an uncanny coincidence of personal detail obviously derived from the FBI report to which the prosecutor was making reference . . .
> . . . The prejudice arose when evidence of identity of person was shown but evidence of conviction under the assumed name was not, for *although the prior conviction which had been the focus of the protracted impeachment interrogation had not been proved, the impression or inference of prior crime was implanted in the jury's consciousness.*

(Italics ours.)

Here, the prosecutor also engaged in protracted impeachment of Mr. Franco. During questioning he referred to an apparent written transcript of the conversation allegedly recorded by Mr. Townsend on a body wire. The format of the prosecutor's questions was, "And then you said . . ." and "You don't remember that?" Mr. Franco specifically denied saying that Ms. Babich was a cocaine dealer, but the prosecutor never introduced extrinsic evidence of the conversation to

rebut that denial. His cross examination of Ms. Maldonado on the same issue was less extensive, but in the same vein. Then, he improperly argued to the jury in closing argument that Ms. Babich was a known cocaine dealer, citing the body wire conversations which were never introduced into evidence.

The State counters Ms. Babich waived any error when she did not object to the prosecutor's cross examination of Mr. Franco and Ms. Maldonado and did not request a curative instruction in response to the prosecutor's closing argument. But in this situation, failure to object is not a waiver. It was not the questions themselves that were improper; *it was the failure to prove the statements in rebuttal that was error.* Until the State rested its rebuttal, Ms. Babich had no way of knowing whether the State would or would not prove the prior statements. By that time it was too late to undo the prejudice resulting from the prosecutor citing those prior statements in questions heard by the jury.

Nor was the error harmless. A violation of the right of confrontation is error of constitutional magnitude. Constitutional error is harmless only if the untainted evidence is so overwhelming it necessarily leads to a finding of guilt. *State v. Guloy,* 104 Wn.2d 412, 426, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020 (1986). The untainted evidence in this case consists of Mr. Townsend's version of events, contradicted by Ms. Babich's and other witnesses' claims of entrapment.

Given the definition of entrapment contained in the jury instructions — "the defendant was lured or induced to commit a crime which the defendant had not otherwise intended to commit" — the cross examination and the argument prejudiced Ms. Babich. If the jury believed she was a known cocaine dealer, based on inferences drawn from the cross examination and closing argument, then it was unlikely to believe Ms. Babich's contention that she was induced to sell cocaine to Mr. Townsend by his giving her alcohol and drugs.

We therefore reverse Ms. Babich's conviction for delivery of cocaine. The convictions for delivery and possession of

marijuana were not affected by the above error. Thus, we affirm those convictions.

■ We briefly address Ms. Babich's second issue because it may be raised in a retrial. She asserts the court erred when it overruled her hearsay objection to Detective Alden's and Gary Townsend's testimony that Mr. Townsend had passed drug tests. We agree the testimony was hearsay. The two witnesses had no personal knowledge of the truth of the matter stated. Their testimony does not fall within any recognized exception to the hearsay rule, ER 803, nor was there a showing that a properly qualified witness was unavailable, or that the out-of-court statement contained such particularized guaranties of trustworthiness as to make cross examination of marginal utility. *State v. Sosa*, 59 Wn. App. 678, 683, 800 P.2d 839 (1990) (citing *Ohio v. Roberts*, 448 U.S. 56, 66, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980)). If the State seeks introduction of the test results on retrial, it must do so through a properly qualified witness.

Reversed.[4]

SHIELDS, C.J., and MUNSON, J., concur.

Review denied at 121 Wn.2d 1015 (1993).

---

[4]We do not address the State's assignment of error because it did not file a notice of cross appeal.