IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| STATE OF WASHINGTON, | ) | No. 79985-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| TODD ANDERS WEBSTER, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

HAZELRIGG, J. — Todd A. Webster seeks reversal of his conviction for assault in the second degree.  He argues that the State failed to comply with its disclosure obligations under CrR 4.7 and the Fourteenth Amendment before trial and that the court erred during trial by limiting his impeachment of an eyewitness, excluding reputation testimony, and refusing to instruct the jury on the lesser included offense of fourth degree assault.  Webster also raises multiple issues in a pro se statement of additional grounds for review.  Finding no error, we affirm.

FACTS

In 2018, Todd Webster, Becky Hernandez, and Aron Willis were tenants at Greenlake Plaza Apartments, a Seattle Housing Authority apartment building.  On March 28, 2018, Webster and Hernandez were in the building's laundry room when Willis turned off the light.  An argument and fist fight between Webster and Willis ensued.  Webster recorded part of the argument on his cell phone, which was

knocked to the ground and broken during the altercation. Eventually, Webster pulled out a pocketknife and began stabbing Willis. Much of the incident was recorded on the building's security cameras.

Webster and Willis both called 911. When the police arrived, Webster was outside smoking a cigarette and bleeding from a cut on his hand. Seattle Fire Department paramedics bandaged his hand, and he was later taken to the hospital. Responding police officers observed a fresh blood trail through the building's laundry room, parking lot, lobby, elevator, and stairwell. They found a folding knife with a two-inch blade that was open and covered in blood on top of a washing machine in the laundry room. Seattle Police Officer Vrndavana Holden spoke with Hernandez and took her statement about the incident.

Responding officers discovered Willis curled up in a pool of blood on the floor just inside the door of his apartment. Willis was awake and alert. Paramedics noted stab wounds to Willis' left cheek, left bicep, the back of his right shoulder, and the front of his left shoulder. They observed an abnormal respiratory rate and lung sounds and decided to intubate Willis out of concern that air or blood in his thoracic cavity was affecting his ability to breathe. Willis was transported to Harborview Medical Center and remained in the intensive care unit until his discharge on April 2, 2018.

About two weeks after the incident, Webster was charged with assault in the second degree and arrested. When he was taken into custody, Webster was in possession of three cell phones. Defense counsel inquired about the phones and was initially told that there were no cell phones in evidence. On July 5, 2018,

the State informed defense counsel that it had located the cell phones, which had been logged under a different case number. The State suggested that Webster consent to a limited search of the phones to retrieve the footage to avoid the more time-consuming process of obtaining a warrant to search the phones. No reply appears in the record.

A week later, defense counsel emailed the State with "a video from the phone in Mr. Webster's pocket" appearing to show parts of the incident and containing a recording of Willis' voice saying, "There's no cameras here . . . I can fucking kick your ass." The State asked how defense counsel had obtained the video. Defense counsel did not respond via email, but a prosecutor submitted a declaration stating that defense counsel had said that the video was on a phone that Webster's brother had retrieved from Webster's apartment. On July 17, 2018, the State emailed defense counsel regarding the surveillance video and cell phone video and making a plea offer. The defense does not appear to have renewed its request to review the contents of the phones in evidence.

On May 6, 2019, Webster filed a motion to dismiss under CrR 8.3, arguing, among other things, that the State had committed misconduct when it failed to preserve and turn over the cell phones. In the motion's certification of facts, defense counsel declared that defense witness Christina Sargent had indicated in the State's interview on May 2, 2019 that she had seen a video on Webster's phone in which a person was "coming at Todd saying 'I'm going to kill you.'" Webster acknowledged the recording obtained from his brother but argued that he was "not able to recreate the time date and time stamp that it was recorded" without the

phone. He also argued that he had not been able to examine the phones to see if any other footage from the night of the incident existed and that he "may be unable to provide a foundational witness to introduce" the cell phone video. The court denied the motion, finding that Webster had not shown that there was arbitrary action or government misconduct or shown prejudice affecting his right to a fair trial.

The State called Hernandez to testify at trial. Hernandez is autistic. She lives independently at Greenlake Plaza, and a counselor assists her with things like paying bills and budgeting. Hernandez testified that, on the night of the incident, she went to the basement of the building to do her laundry. Webster was in the laundry room, and Hernandez chatted with him a bit. While they were in the laundry room, Willis came in and turned off the lights. Webster "got on [Willis'] case about turning off the lights," and the two began arguing. They then began pushing each other and throwing punches. Hernandez described Willis "[p]ushing, grabbing and then choking [Webster], you know, strangling him." Webster pulled out his cell phone and began recording the altercation. The phone fell to the ground and broke. Hernandez initially testified that Willis had smashed the cell phone on the ground and stomped on it. However, when the State showed Hernandez the surveillance video in court, she admitted that she had not actually seen Willis stomp on the cell phone but had heard the phone crack when it hit the ground. After the phone broke, Webster pulled out a pocketknife and began stabbing Willis. Hernandez testified that, when Webster was stabbing Willis, he said, "Don't you ever break my cell phone again."

Before cross-examination, defense counsel indicated that she intended to impeach Hernandez's in-court testimony with a prior inconsistent statement that she had made to Holden on the night of the incident. Defense counsel made an offer of proof that, on the night of the incident, Hernandez had indicated that Willis pushed Webster after choking him and that Webster took out the knife to defend himself. The court agreed "that statement appears to be a prior inconsistent statement that's ripe for impeachment." The court also stated that it would allow impeachment on the following statement made by Hernandez on the night of the incident: "So all that blood, he splattered all over him after he got mad at that guy and said don't because he was choking [Webster], so [Webster] had to defend himself. He had to defend himself because he thought he was going to hit me also, that other guy." The court did not allow impeachment using parts of Hernandez's statement in which she "seem[ed] to be speculating and kind of getting into people's minds." Defense counsel also sought to impeach Hernandez's testimony that Webster made a statement about breaking his phone while he was stabbing Willis, which the court permitted.

On cross-examination, Hernandez initially denied that she thought Willis might hit her during the altercation but then admitted that she had made a statement to that effect to the police on the night of the incident. She agreed with defense counsel's question that "maybe now you're not afraid, but at that moment you were afraid?" Hernandez also agreed that she had told the police that Webster acted in self-defense and that, before Webster took out his knife, Willis pushed Webster and Webster took out his phone and tried to get Willis to leave them alone.

However, Hernandez maintained that Webster was angry because Willis broke his phone:

> [DEFENSE:] . . . Becky, you told the police officer that Todd got out the knife to scare Aron away; isn't that right?
>
> [HERNANDEZ:] No, to express that he was angry at Aron for breaking his cell phone, because he got angry about someone breaking his cell phone like Aron who broke the cell phone. He got angry about that.
>
> [DEFENSE:] I understand that's what you said today. I'm asking what you told the police officer?
>
> [HERNANDEZ:] That's what I told the police officer, yeah.
>
> [DEFENSE:] That is what you told the police officer?
>
> [HERNANDEZ:] Yes. At that time.
>
> [DEFENSE:] The first night?
>
> [HERNANDEZ:] Mm-hm.
>
> [DEFENSE:] Okay.

Defense counsel did not attempt to show Hernandez the statement that she had made to Holden but elicited that Willis and the building manager at Greenlake Plaza had spoken with Hernandez about the incident between the time she gave her statement to the police and the trial.

During cross-examination of Holden, defense counsel began asking questions about Hernandez's statements on the night of the incident. The State objected, stating that it did not think this was "proper impeachment and it's bordering on eliciting hearsay as well." Outside the presence of the jury, defense counsel explained that the line of questioning was intended to impeach Hernandez's trial testimony that she told Holden the night of the incident that Webster had used his knife because he was angry that his phone was broken:

> What I would like to be clear to the jury is until testimony on direct, there was no evidence that she said to Officer Holden that Mr. Webster used the knife because he was angry his phone was broken which is what she said on direct, and she did not say that to Officer Holden the night that this occurred.

- 6 -

The court pointed out that Hernandez had admitted making prior inconsistent statements during cross-examination and indicated that it did not view the challenged piece of Hernandez's testimony as inconsistent with her prior statement. Defense counsel was not permitted to elicit testimony that Hernandez had not made the prior statement to Holden.

Webster sought to have two witnesses, Christina Sargent and Christine Hadfield, testify that Willis had a reputation for violence in the Greenlake Plaza community. The State objected on foundational grounds. The court held a hearing outside the presence of the jury to determine whether an appropriate foundation for the reputation testimony could be established. Sargent testified that she lived at Greenlake Plaza in March of 2018 and had been living there for about three years at the time. The building had at least 130 residents and contained a number of community spaces. Sargent spoke with other tenants in the community room every day. She testified that she had spoken with other tenants about Willis a couple of times when she first moved in. Sargent stated that he had a bad reputation for violence.

On cross-examination, Sargent admitted that her interactions with Willis at Greenlake Plaza were limited. She acknowledged telling the prosecutor that, before the stabbing, she thought Willis was a "nice guy." She admitted that she had never seen or heard of Willis acting violent toward anyone in the building apart from the incident with Webster. She noted that she had heard about Willis throwing chairs over the fence and yelling, but no one had ever told her before this incident that Willis was violent toward people.

Sargent stated that she developed the opinion that Willis was violent after the altercation with Webster. She described instances in which Willis would not move out of the way to let her pass, made a nasty remark and would not get into an elevator with her, and posted something on the community room wall. She admitted that all of these instances had taken place after Willis' altercation with Webster and that she believed he was acting this way toward her because he heard that she was supporting Webster. On redirect examination, Sargent stated that Willis' reputation among the tenants developed before the incident with Webster.

The court then inquired whether Willis had a reputation for violence within the community at Greenlake Plaza before the date of the incident. Sargent responded, "Not with people, but we were becoming concerned." She clarified that five or six people had told her "[t]hat he was throwing chairs; that his demeanor was gruff with him or they were afraid. One person was afraid and they thought he might have been off his meds because he was throwing the chairs and yelling."

Hadfield testified that she had lived at Greenlake Plaza for almost twenty years. She stated that she spent a lot of time in the community room socializing with other tenants. She testified that she had spoken with other tenants about Willis and that he had a bad reputation for violence in March of 2018.

On cross-examination, Hadfield admitted describing his reputation for violence to the prosecutor by saying that Willis had a habit of looking straight ahead with a funny expression on his face and sometimes would not respond to her greetings. She also indicated that she had never seen or heard of Willis being

physically violent toward another person. She stated that the description of Willis as violent was "based on emotional violence," meaning "[t]he way he spoke to people," and throwing chairs over the fence. Hadfield also described Willis' "verbal violence," recounting an incident three weeks before in which she said hello to Willis and he "said some cuss words at [her]." She stated that she had heard from a few people that Willis speaks to people in an unkind way.

The court asked Hadfield for specific examples of issues and concerns that people in the community were talking about before the altercation between Willis and Webster. Hadfield stated that "people were speaking of Aron Willis in an emotionally violent way, not physically violent, but emotionally and verbally violent." She also stated that he had a very angry demeanor.

The court ruled that the witnesses could not establish the proper foundation for a reputation of "violence as in physical violence versus a person." The incidents described by Sargent and Hadfield had "nothing to do with physical violence; it has to do with the fact that perhaps Mr. Willis is rude."

Webster proposed a jury instruction on the lesser included offense of assault in the fourth degree, which the court declined to give. The jury found Webster guilty of second-degree assault with a deadly weapon enhancement. He received a 15-month standard range sentence. Webster appealed.

ANALYSIS

I.     Disclosure

Webster argues that the State fail to comply with its obligations under CrR 4.7 and the Fourteenth Amendment by failing to turn over video footage from

Webster's cell phone. We review alleged due process violations de novo. State v. Mullen, 171 Wn.2d 881, 893, 259 P.3d 158 (2011).

The State is obligated to turn over evidence in its possession that is both favorable to the defendant and material to guilt or punishment. CrR 4.7(a)(3); In re Pers. Restraint of Rice, 118 Wn.2d 876, 887, 828 P.2d 1086 (1992). Suppression of such evidence violates due process "irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). "Evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Rice, 118 Wn.2d at 887 (quoting U.S. v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)). The question when determining whether a reasonable probability of a different result exists "is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).

To show a violation of Brady v. Maryland, a defendant must establish that (1) the evidence at issue is favorable to the defendant either because it is exculpatory or because it is impeaching, (2) the evidence was willfully or inadvertently suppressed by the State, and (3) prejudice has ensued. Mullen, 171 Wn.2d at 895.

Here, Webster cannot show a Brady violation because he has not demonstrated prejudice. The record shows that the cell phone video obtained by

the defense from Webster's brother captured the incident beginning before Willis entered the laundry room and ending when Webster's phone was knocked to the ground. The video was admitted as an exhibit during Willis' testimony and shown to the jury. That phone and its video had not been in the State's possession. There was no indication that Webster was filming on multiple phones. Because Webster has not shown that he was prejudiced by the State's failure to turn over Webster's other cell phones that were in evidence, he has not proven that the State violated its obligations under Brady.

II.     Impeachment

Webster contends that the trial court erred in preventing him from impeaching Hernandez through Holden's testimony. We review a trial court's determinations regarding the admissibility of evidence and the scope of cross-examination for an abuse of discretion. State v. Stenson, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997); State v. Dixon, 159 Wn.2d 65, 75, 147 P.3d 991 (2006). A trial court abuses its discretion when its exercise of discretion is manifestly unreasonable or based on untenable grounds or reasons. Stenson, 132 Wn.2d at 701.

Any party may challenge the credibility of a witness. ER 607. Impeachment evidence is relevant and potentially admissible if it tends to cast doubt on the credibility of the person being impeached and if the person's credibility is a fact of consequence to the action. State v. Allen S., 98 Wn. App. 452, 459–60, 989 P.2d 1222 (1999). "In general, a witness's prior statement is admissible for

impeachment purposes if it is inconsistent with the witness's trial testimony." State v. Newbern, 95 Wn. App. 277, 292, 975 P.2d 1041 (1999).

ER 613 provides that extrinsic evidence of a prior inconsistent statement is not admissible unless the witness is first given an opportunity to explain or deny the inconsistency. ER 613(b). "Proper impeachment by prior inconsistent statement utilizes a procedure in which the cross examiner first asks the witness whether he made the prior statement." State v. Babich, 68 Wn. App. 438, 443, 842 P.2d 1053. If the witness admits making the prior inconsistent statement, extrinsic evidence of the statement is inadmissible. Dixon, 159 Wn.2d at 76. However, if the witness denies the prior statement, extrinsic evidence of the statement is generally admissible. Babich, 68 Wn. App. at 443.

During cross-examination, Hernandez admitted that a number of her statements on direct examination were inconsistent with her prior statements to police. She confirmed that Willis had pushed and choked Webster before Webster took out the knife. She also admitted that she had initially told the police that Webster stabbed Willis in self-defense. Hernandez maintained, however, that she told Holden that Webster pulled the knife because he was angry over his broken cell phone. In response to this testimony, defense counsel did not confront Hernandez with her recorded statement to Holden to establish she had not in fact made such a statement to police. Because Webster did not give Hernandez the opportunity to explain or deny any prior inconsistency, the trial court did not abuse its discretion in denying Webster's request to introduce extrinsic evidence of the prior statement.

III.    Exclusion of Witnesses

Webster next contends that the trial court erred in excluding testimony from two witnesses who would have testified to Willis' reputation for violence in the Greenlake Plaza community.  We review a trial court's decision regarding the sufficiency of the foundation for proffered reputation testimony for an abuse of discretion.  State v. Callahan, 87 Wn. App. 925, 935, 943 P.2d 676 (1997).

Evidence of a person's character is generally not admissible to show that they acted in conformity with their character on a particular occasion.  ER 404(a).  An exception to this general rule exists for "[e]vidence of a pertinent trait of character of the victim of the crime."  ER 404(a)(2).  Evidence of a character trait "must be in the form of reputation evidence, not evidence of specific acts."  State v. Hutchinson, 135 Wn.2d 863, 886, 959 P.2d 1061 (1998), abrogated on other grounds by State v. Jackson, 195 Wn.2d 841, 467 P.3d 97 (2020).  Reputation evidence must be based on "the witness's personal knowledge of the victim's reputation in a relevant community during a relevant time period."  Callahan, 87 Wn. App. at 934.

In State v. Hutchinson, the Washington Supreme Court noted that the trial court properly excluded "several witnesses who would have testified only that [the victim] was intimidating, or rude" because this testimony would not have been sufficient to show the victim's reputation for violence.  135 Wn.2d at 886.  The same is true in this case.  Sargent and Hadfield both admitted that they had not heard of any instances in which Willis was physically violent toward another person.  Their testimony indicated that Willis' reputation was largely based on his

general rudeness and angry demeanor. Although both cited the chair-throwing incident as a basis for Willis' reputation, the trial court did not abuse its discretion in determining that this did not indicate that Willis had a reputation for physical violence toward others.

IV.    Jury Instructions

Webster next contends that the trial court erred in refusing to give his requested jury instruction on the lesser included offense of fourth degree assault.

Washington courts analyze whether a defendant is entitled to an instruction on a lesser included offense under the two-pronged test outlined in State v. Workman, 90 Wn.2d 443, 447–48, 584 P.2d 382 (1978). "First, each of the elements of the lesser offense must be a necessary element of the offense charged. Second, the evidence in the case must support an inference that the lesser crime was committed." Id. (citations omitted). These two conditions are referred to as the "legal prong" and "factual prong" of the test, respectively. State v. Berlin, 133 Wn.2d 541, 546, 947 P.2d 700 (1997).

We review the trial court's conclusion on the legal prong de novo and review a determination that the factual prong was not satisfied for an abuse of discretion. State v. Condon, 182 Wn.2d 307, 315–16, 343 P.3d 357 (2015). The parties agree that the legal prong of the Workman test was satisfied. The trial court refused to give the requested instruction because it ruled that the factual prong was not satisfied. We review this decision under the abuse of discretion standard.

Under the factual prong of the Workman test, "the evidence presented in the case [must] support an inference that only the lesser offense was committed,

to the exclusion of the greater, charged offense." Condon, 182 Wn.2d at 316. When assessing whether the evidence was sufficient to support the requested instruction, we view the evidence in the light most favorable to the party that requested the instruction. State v. Fernandez-Medina, 141 Wn.2d 448, 455–56, 6 P.3d 1150 (2000). However, "the evidence must affirmatively establish the defendant's theory of the case—it is not enough that the jury might disbelieve the evidence pointing to guilt." Id. at 456.

A party commits second degree assault when they "[i]ntentionally assault[] another and thereby recklessly inflict[] substantial bodily harm" or "[a]ssault[] another with a deadly weapon." RCW 9A.36.021(1)(a), (c). "A person is guilty of assault in the fourth degree if, under circumstances not amounting to assault in the first, second, or third degree, or custodial assault, he or she assaults another." RCW 9A.36.041(1). Therefore, to satisfy the factual prong of the Workman test, the evidence must show that Webster did not inflict substantial bodily harm on Willis and that the pocketknife was not a deadly weapon.

"Substantial bodily harm" is defined as "bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part." RCW 9A.04.110(4)(b). Webster argues that the stab wounds do not meet this definition because Willis' hospital records described the wounds as "superficial," meaning that the cuts did not go beyond the skin and muscle tissue and into the chest cavity.

"[T]he term 'substantial,' as used in RCW 9A.36.021(1)(a), signifies a degree of harm that is considerable and necessarily requires a showing greater than an injury merely having some existence." State v. McKague, 172 Wn.2d 802, 806, 262 P.3d 1225 (2011). Washington courts have upheld jury findings of substantial bodily injury based on less severe temporary disfigurement than Willis sustained here. See, e.g., id. (facial bruising and swelling lasting several days and lacerations to the victim's face, back of the head, and arm); State v. Hovig, 149 Wn. App. 1, 12–13, 202 P.3d 318 (2009) (bite-mark bruise lasting up to two weeks); State v. Ashcroft, 71 Wn. App. 444, 455, 859 P.2d 60 (1993) (bruise marks consistent with being hit by a shoe).

Regardless of whether the stab wounds caused a temporary but substantial loss or impairment of Willis' lung function, his injuries constituted a temporary but substantial disfigurement. Willis sustained stab wounds to his face and torso. The jury heard testimony that such facial wounds usually require sutures to lessen the scarring. The evidence did not support an inference that Webster did not inflict substantial bodily harm on Willis.

Likewise, Webster cannot show that the pocketknife was not a deadly weapon. The definition of a "deadly weapon" includes any weapon "which, under the circumstances in which it is used, . . . is readily capable of causing death or substantial bodily harm." RCW 9A.04.110(6). When evaluating whether an object meets this definition, we look to "the circumstances in which the object is used, including '"the intent and present ability of the user, the degree of force, the part of the body to which it was applied and the physical injuries inflicted.'" State v.

Holmes, 106 Wn. App. 775, 781–82, 24 P.3d 1118 (2001) (quoting State v. Shilling, 77 Wn. App. 166, 171, 889 P.2d 948 (1995) (internal quotation marks omitted)).

"[A] pocketknife may be a deadly weapon, depending on the circumstances of its use." State v. Thompson, 88 Wn.2d 546, 549, 564 P.2d 323 (1977). This court found that possession of a switchblade knife alone was insufficient to render the knife a deadly weapon: "there must be some manifestation of willingness to use the knife before it can be found to be a deadly weapon." State v. Gotcher, 52 Wn. App. 350, 354, 759 P.2d 1216 (1988). In State v. Thompson, the Washington Supreme Court found that the jury could properly find that an open pocketknife with a blade between two and three inches long was a deadly weapon when held against the neck of the victim, who sustained a cut on her neck and bruises on her arm. 88 Wn.2d at 550.

Here, Webster clearly manifested willingness to use the knife and in fact used the knife as a weapon, inflicting multiple stab wounds to Willis' head and torso. He did not merely possess the knife, like the defendant in State v. Gotcher, and Willis' injuries were more severe than the victim's in Thompson. As used here, the pocketknife was readily capable of causing death or substantial bodily harm if the blade struck one of the vital organs or major blood vessels located in the head and upper torso. Even viewed in the light most favorable to Webster, the evidence does not support an inference that the pocketknife was not a deadly weapon. The trial court did not abuse its discretion in refusing to instruct the jury on the lesser included offense of fourth degree assault.

V.    Cumulative Error

Finally, Webster argues that the individual errors outlined above require reversal and that the cumulative effect of the errors denied him a fair trial and violated his right to present a defense.  Because we find no error, we do not address this argument.

VI.    Statement of Additional Grounds for Review

In a pro se statement of additional grounds for review (SAG), Webster identifies twelve issues for our review, including the denials of his five motions to discharge counsel, exclusion of evidence, and allegations of threats and perjury. We are not able to consider issues in a SAG that do not adequately inform us "of the nature and occurrence of alleged errors."  RAP 10.10(c).  In addition, "issues that involve facts or evidence not in the record are properly raised through a personal restraint petition, not a statement of additional grounds."  State v. Calvin, 176 Wn. App. 1, 26, 316 P.3d 496 (2013).

Webster's additional grounds numbered 1, 2, 7, and 10 include allegations that Hernandez was threatened and forced to testify.  These arguments appear to rely on facts outside the record, so we decline to consider them.  Additional grounds 3, 5, and 6 simply cite to rules of evidence and do not adequately inform us of alleged errors.  Issues 4, 7, and 12 concern the exclusion of evidence, but it is not clear whether Webster is assigning error to the court's ruling or alleging that his counsel was ineffective.  The remaining grounds allege improper exclusion of expert testimony, violation of attorney-client privilege, and violation of the rules of

professional conduct. We are unable to find support for these claims in the record and decline to consider them.

Affirmed.

_____

WE CONCUR:

_____        _____
Andrus, A.C.J.                              Appelwick, J.