IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 77782-3-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ZAKARIA SUMBUNDU, | ) | |
| | ) | |
| Appellant. | ) | FILED: December 16, 2019 |

SCHINDLER, J. — A jury convicted Zakaria Sumbundu of unlawful possession of a kilogram of cocaine with intent to deliver, count 1; conspiracy to deliver a controlled substance, count 2; and maintaining a vehicle for drug trafficking, count 3. By special verdict, the jury found Sumbundu was armed with a firearm and the convictions were a major Violation of the Uniform Controlled Substances Act, chapter 69.50 RCW. Sumbundu seeks dismissal of count 1 and count 3, claiming insufficient evidence supports the convictions of possession with intent to deliver and maintaining a vehicle for drug trafficking. Sumbundu seeks reversal of count 2, conspiracy to deliver a controlled substance, asserting the to-convict jury instruction misstates the law. Sumbundu also contends the trial court abused its discretion by denying his motion for a mistrial and prosecutorial misconduct and cumulative error deprived him of the right to a fair trial. We affirm the convictions of possession with intent to deliver and maintaining a

vehicle for drug trafficking. We reverse the conviction for conspiracy to deliver a controlled substance and remand for a new trial. On remand, the court shall also correct the judgment and sentence to accurately state the maximum sentence for maintaining a vehicle for drug trafficking.

## FACTS

In March 2014, United States Department of Homeland Security (DHS) Special Agent Omar Maldonado followed up on a drug trafficking "investigative lead."[1] Posing as "Tony," "a cocaine source of supply," Agent Maldonado arranged to meet Bahaa Sajih Hilal at a Starbucks in Bellingham.

Hilal told Agent Maldonado he "had a friend who could purchase two to three kilograms of cocaine at a time, and would eventually want to purchase five kilograms of cocaine at a time." Hilal and Agent Maldonado discussed the "quality of cocaine," the type of "stamps imprinted on the kilograms of cocaine" that indicate the country of manufacture and symbolize the quality of the cocaine, and "the price per kilogram." They discussed "high-grade cocaine" sold at "approximately $28,500, $28,000 or so per kilogram" but did not agree on the price. Hilal told Tony that "the cocaine was going to be distributed in Washington." Because federal investigations require an international connection, Agent Maldonado turned the investigation over to the Whatcom County Gang and Drug Task Force.

Agent Maldonado contacted Hilal and said that "his cousin" would contact Hilal to supply the cocaine. United States Customs and Border Protection Agent Jorge Carrasco worked as part of the Whatcom County Gang and Drug Task Force. Posing

---

[1] DHS investigates international drug trafficking activities.

2

as "Hector," Agent Carrasco called Hilal. Hilal told Hector that he was "looking to purchase" cocaine. Hilal said he wanted "a thousand dollars per kilo sold" and was "acting as a broker" for someone who was "interested in purchasing" cocaine.

On May 16, Agent Carrasco met Hilal at a Starbucks in Bellingham. Agent Carrasco showed Hilal the kilogram of cocaine in the trunk of his car. Hilal said his "buyer would probably be interested in buying it that day." Agent Carrasco told Hilal that "we couldn't do it that day, to just let his buyer know that I did have product on hand and that I could meet his demands." After the meeting, a surveillance team followed Hilal to his home in the Seattle area.

Hilal called Agent Carrasco later that same day to say that "his buyer was interested and wanted to know when we could make arrangements." Agent Carrasco "texted him a price" of $28,500. Hilal replied with "28." Agent Carrasco agreed to $28,000 for the kilogram of cocaine and arranged the exchange for May 20 at the "[p]ark and ride off of Samish and I-5"[2] in Bellingham. The task force planned to arrest Hilal and the buyer after the exchange at the park and ride.

Drug Enforcement Administration Special Agent Tommy Wheeler assisted with surveillance on May 20. Agent Wheeler followed Hilal to the Prudent Autodeals Inc. car lot on Lake City Way in Seattle. Zakaria Sumbundu picked up Hilal at Prudent Autodeals in his silver Infiniti. A helicopter surveillance team video-recorded the Infiniti as it drove to the park and ride in Bellingham.

---

[2] Lake Samish Road and Interstate 5.

The backpack with a kilogram of cocaine was in a "separate vehicle, a minivan," at the "other end of the park and ride." Agent Carrasco was wearing "a wire" to audio record conversations and a "takedown team" was waiting nearby.

The surveillance video shows the silver Infiniti pull into the park and ride parking lot. The car pulls into a parking space and stops. Hilal gets out of the passenger side and goes to meet Agent Carrasco. Shortly thereafter, Sumbundu gets out of the Infiniti.

Hilal introduced Sumbundu to Hector. The three men stand next to Sumbundu's Infiniti for several minutes talking. Agent Carrasco asks Sumbundu if he is "the man or if he was just the man with the money." Sumbundu replied that he was "indeed the man." In the audio recording, Sumbundu discussed buying more cocaine. Sumbundu said he could purchase " 'four or five' " in a month. Sumbundu told Agent Carrasco, " 'I cook. I don't sell powder . . . . I have people lining up . . . . I can move it.' " Sumbundu told Agent Carrasco he was going to "cook" the cocaine to "cut the purity so that they can make more." Agent Carrasco asked, " 'What about anything else, you interested in like crystal or black or anything?' " Sumbundu said, " 'I know people' " who do. Sumbundu said he could pay " 'cash.' "

Sumbundu told Agent Carrasco that if he calls him, " 'you always be there. . . . Boom, boom, boom, boom.' " Sumbundu told Agent Carrasco, " '[Y]ou're talking [to] the main man. . . . [U]niversity [District] area, all that area, we lock that shit down.' " Sumbundu said, " 'University is in the middle of my hand. . . . [A]nybody slinging in [U]niversity is working for me.' "

4

Agent Carrasco asked Sumbundu, " 'So why you coming up here.' " Sumbundu said, " 'I got to come and check it out.' " Agent Carrasco said, " 'Because when I go down to Seattle you're going to be sorry you didn't get two after all. . . . You gotta see that shit.' " Sumbundu laughed and said, " 'I'm coming back in two days.' "

Agent Carrasco then asked, " 'You got the cash on you?' " Sumbundu said, " 'Yeah. I got the cars[3] and everything.' " Agent Carrasco "asked to see the money." Sumbundu walked to the driver's side of the Infiniti, "brought out a small cardboard box, and opened it." Agent Carrasco saw "bundles" of money and told Sumbundu, " 'A lot of 20s. It's all good. It's all good.' "

The surveillance video shows Sumbundu walk to the trunk of his car and open it. The video shows Sumbundu and Agent Carrasco talking near the open trunk of the Infiniti. After Sumbundu opened the trunk, Agent Carrasco "saw the rest of the money." Hilal is standing behind Sumbundu and Agent Carrasco as they lean over the trunk. As Sumbundu "started pulling money out and putting it together" inside the trunk of the car, Agent Carrasco walked with Hilal to get the kilogram of cocaine.

On the way, Hilal asked Agent Carrasco, " '[C]an you get closer a little bit to Seattle?' " Agent Carrasco said, " 'It's going to be a little more expensive . . . but if he's going to be big then I'll go.' " Hilal said, " 'Meet halfway . . . . It doesn't have to be in Seattle.' "

Agent Carrasco showed Hilal the kilogram of cocaine in the backpack. Agent Carrasco paid Hilal $1,000 and gave him the backpack. The surveillance video shows

---

[3] Agent Carrasco testified that "cars" is the terminology Hilal used to "refer to kilos of cocaine."

5

Hilal walk back to the Infiniti and put the backpack with the kilogram of cocaine in the trunk of the car. The police immediately moved in to arrest Sumbundu and Hilal.

The surveillance video shows Hilal immediately lying down on the ground and officers placing him in handcuffs. Sumbundu was standing near the trunk of the Infiniti. DHS Special Agent Frank Kerr told Sumbundu, "Police, federal agents, put your hands in the air." When Sumbundu "slowly started putting his hands down towards his waist," Agent Kerr ordered him to "raise his hands and then to get on the ground." Sumbundu complied. Agent Kerr "rolled him up on his side" and found "a handgun in his front waistband" with "several rounds in the magazine."

Sumbundu waived his Miranda[4] rights and agreed to talk to the police. Sumbundu told Whatcom County Sherriff's Detective Matthew High that "he got himself into something that he shouldn't have." Sumbundu said he "went with Mr. Hilal to purchase a thing." Sumbundu told Detective High that Hilal "asked him to contribute some money which he would then pay him back to purchase this thing." Sumbundu told Detective High that Hilal "asked him to lend him $9,000 to buy a thing." Sumbundu said he was going to get $2,000 in return for loaning Hilal $9,000. Detective High asked, " '[W]hat is this thing.' " Sumbundu said it was "probably weed."

Sumbundu told Detective High that when he picked up Hilal at Prudent Autodeals earlier that day, Hilal put "the money in the trunk of the car" and "gave him the gun." Sumbundu denied selling "weed or cocaine." Sumbundu told Detective High that he smoked marijuana but "he didn't say he had anything to do with cocaine."

---

[4] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

6

Detective High obtained a warrant to search Sumbundu's Infiniti. Detective High found the kilogram of cocaine in the backpack in "the trunk of the" car. There was also approximately 13 grams of cocaine in "the driver's side door," 3 "small little baggies of marijuana" in the driver's side compartment, and 10 "smaller bags containing marijuana" in the center console of the Infiniti. There was "loose currency" in the trunk of the Infiniti. The majority of the money was in "a cardboard box" and $4,650 was "[j]ust around the box." The total amount of currency seized from the car plus the $603 seized from Sumbundu when he was arrested totaled $28,193.

The State charged Hilal and Sumbundu with possession of a kilogram of cocaine with intent to deliver in violation of RCW 69.50.401(1) and (2)(a), count 1; and conspiracy to deliver a controlled substance in violation of RCW 69.50.407 and RCW 69.50.401(1) and (2)(a), count 2. The State charged Sumbundu with maintaining a vehicle premises for drug trafficking in violation of RCW 69.50.402(1)(f), count 3. The State alleged Sumbundu or an accomplice was armed with a firearm during the commission of the crimes and the offenses were a major Violation of the Uniform Controlled Substances Act, chapter 69.50 RCW, in violation of RCW 9.94A.535(3)(e).[5]

Sumbundu pleaded not guilty. Sumbundu asserted a general denial defense. Before trial, Hilal pleaded guilty as charged to possession of a kilogram of cocaine with intent to deliver.

---

[5] The information alleged:

[T]he current offense[s] [are] a major violation of the uniform controlled substances act, Chapter 69.50 RCW (VUCSA), related to trafficking and controlled substances, which w[ere] more onerous than the typical offense of [their] statutory definition: (i) the current offense[s] involved an attempted or actual sale or transfer of controlled substances in quantities substantially larger than for personal use pursuant to RCW 9.94A.535(3)(e); all of which violation[s] [are] a Class B [or C] Felony.

At the beginning of trial, defense counsel for the first time asserted an affirmative defense of necessity.

> [DEFENSE COUNSEL]: It's more along the lines of Mr. Sumbundu is generally denying his involvement in this completely. That's why the defense of general denial was put forth.
> THE COURT: Mm-hmm.
> [DEFENSE COUNSEL]: Mr. Sumbundu insists he had nothing to do with this drug transaction at all. The defense of necessity relates solely to an explanation as to some of the statements he made to law enforcement during the course of the arrest or the buy/bust operation. And that Mr. Sumbundu's statements, he believed, were necessary in order to protect himself.

In the opening statement, the prosecutor described the initial meeting between Agent Maldonado and Hilal about purchasing a kilogram of cocaine, the later meeting between Agent Carrasco and Hilal, the Whatcom County Gang and Drug Task Force operation on May 20, and the arrest of Hilal and Sumbundu. The defense reserved giving an opening statement until the end of the State's case-in-chief.

A number of witnesses testified at trial, including Agent Maldonado, Agent Carrasco, Hilal, Detective High, Agent Kerr, Whatcom County Sheriff's Deputy Jason Thompson, and Washington State Patrol Crime Laboratory (WSPCL) forensic scientist Daniel Vanwyk. The court admitted into evidence a number of exhibits, including the kilogram of cocaine; the May 20 audio DVD[6] recording of the conversations between Agent Carrasco, Sumbundu, and Hilal; the surveillance video DVD; the 13 grams of cocaine, the several small "baggies" of marijuana, and the documents found in Sumbundu's Infiniti; and the gun Sumbundu was carrying when he was arrested. The prosecutor played the audio and video recordings for the jury.

---

[6] Digital versatile disc.

8

Hilal testified he pleaded guilty to possession of a kilogram of cocaine with intent to deliver, a "20 month" sentence, and the State dismissed the conspiracy to deliver a controlled substance charge. Hilal said he received a subpoena and his testimony was not part of the plea bargain.

Hilal testified that when he met with "Hector,"

[w]e talked about buying from him, and he told me — he showed me what he have. He opened his trunk, and he showed me what he have, and he said, "that's the product." I said "okay." So after that just — I talked to him; he said, "talk to your guy and see how we're going to fix it." I said "okay" so I contacted Mr. Sumbundu and I tried to set up the deal.

Hilal said he met Sumbundu at Prudent Autodeals and had known him for the past three or four years. Hilal testified that he was in financial straits and asked Sumbundu whether he knew if " 'anybody wanna buy' " cocaine. Sumbundu told Hilal, " '[Y]eah I deal with that.' "

I used to see [Sumbundu] in a friend of mine's car lot in Lake City Way, and we used to smoke weed and stuff like that. So when I was desperate I was asking a question, I said "do you know anybody wanna buy" because I'm desperate for a thousand dollars to pay my rent and stuff like that. He said, "yeah I deal with that." I said "you sure" he said "yeah."

Hilal said Sumbundu "asked me for the price" and "I told him it was $28,000." Sumbundu told Hilal he had the money. Hilal testified he sent a text to Hector to arrange to buy the kilogram of cocaine and meet at the park and ride in Bellingham on May 20, 2014. Hilal testified, "I told Mr. Sumbundu about that, and we decided to meet at the car lot and drive from there." Hilal said that when they met at Prudent Autodeals on Lake City Way, he did not "bring any money with [him] to the car lot" and he did not know Sumbundu had a gun. Hilal testified Sumbundu never said that he was going with

Hilal "to buy a car."

> Q. Do you recall discussing with Mr. Sumbundu the purchase of a vehicle for about $29,000 up in Whatcom County?
> A. It was 28,000, not 29, and it wasn't about a car.
> Q. Okay. You don't recall a conversation like that?
> A. About car, no.

When they left Seattle, Sumbundu was "driving his own car," the silver Infiniti. Hilal was sitting in the passenger seat and had never been in Sumbundu's Infiniti before. On the way to Bellingham, Hilal and Sumbundu "discussed that [Sumbundu] had the [money] to buy and we discussed me getting thousand dollar from Hector after I introduced them."

Hilal testified that when they arrived at the park and ride, "Hector was there standing by a car. We'd parked the car next to him, and I talked to him. I got out of the car, and I talked to Hector and introduced him to Mr. Sumbundu." Hilal testified Sumbundu "was collecting the money from . . . inside the car . . . and the trunk, also." Hilal said Sumbundu "opened the trunk" of his Infiniti and "got the money from the trunk." Hilal said that while he went with Agent Carrasco "to get the drugs," Sumbundu stayed at the Infiniti, "counting the money" in the trunk. Hilal testified that Agent Carrasco "opened the backpack and showed me what he had." Hilal took the backpack with the kilogram of cocaine and began walking back to Sumbundu's car. The video shows Hilal throw the backpack in the trunk of the Infiniti before the police arrested him.

Hilal testified that after they were arrested, he spoke to Sumbundu "[o]ne time when we were in the jail" for "five minutes." Hilal said he told Sumbundu that he "didn't

know" Hector was a law enforcement officer. Sumbundu "was upset that we got busted, and he was saying that like I have to own it. It's like it's my fault."

Detective High was responsible for overseeing and coordinating the Whatcom County Gang and Drug Task Force operation on May 20. Detective High testified about his experience in drug enforcement. Detective High testified that "depending on the quality," in May 2014, a kilogram of cocaine sold for between $22,000 and $28,000. Detective High testified the amounts used for personal use vary. Detective High said the 13 grams of cocaine found in Sumbundu's car "could be used for purpose of delivery." Detective High said that he purchased 3 grams of cocaine in 2014 while working undercover for $150, and $50 a gram was "a good deal." Detective High said the median going rate for a gram of cocaine in 2014 was $75.

Detective High testified the kilogram or 1,000 grams of the cocaine seized from Sumbundu's car is "a lot of cocaine." Detective High testified a kilogram of cocaine is purchased for the purpose of delivery and to "[c]ut it into smaller amounts" to sell for more than the "wholesale" price of $28,000.

Detective High testified the police found 3 small plastic bags of marijuana and 10 other baggies of marijuana inside Sumbundu's car. Detective High said the 10 bags would sell for $20 each in 2014. Detective High testified that the 10 bags of marijuana "seem[ed] to be of equal weight, so my training and experience as a narcotics detective led me to believe they were packaged to resell."

Detective High testified the police seized Washington State Department of Licensing documents from Sumbundu's car that showed Sumbundu purchased the Infiniti on May 6, 2014 and he was the registered owner of the car.

Agent Carrasco testified that when he met Sumbundu at his Infiniti and asked to see the money to buy the kilogram of cocaine, he saw "several bundles" of cash that "appeared to be $20 . . . bills."

> A.  I asked him for the money.  I asked to see the money, at which point he went back into the driver's side of the vehicle and brought out a small cardboard box, and opened it, and I noticed several bundles of U.S. currency which appeared to be $20 . . . bills.  And from there he walked to the trunk of the vehicle.  And —
> Q.  What was Mr. Hilal doing during this time?
> A.  He was off to the side; he wasn't talking.
> . . . .
> Q.  Okay.  So when Mr. Sumbundu brought out a cardboard box, it had a lid on it?
> A.  It looked like maybe a CD[7] carrier box or something.  A CD player.
> Q.  The money that you saw was bundled, you said, how bundled; how was it done?
> A.  It looked like it was just folded in half with rubber bands.
> . . . .
> Q.  Was the money he brought out from the car, all the money that you saw?
> A.  No, ma'am.  That's when he went to the trunk and opened the trunk, and that's where I saw the rest of the money or more money.
> . . . .
> Q.  Did you ever see Mr. Sumbundu combine money from the box into some other —
> A.  Yeah.
> Q.  — or combine money?
> A.  That's what he was doing.  Once he opened the trunk, he started pulling money out and putting it together.

Agent Carrasco testified he told Sumbundu, "It's going to take a while to count."

Agent Carrasco testified $20 bills are significant:

> Q.  Did you make any comment to him about the denomination of the money?
> A.  I may have.  I can't recall for sure.
> Q.  Do you remember the denomination?
> A.  I remember 20s, a lot of 20s.  I may have said something to that effect.

---

[7] Compact disc.

Q.  Okay.  A lot of 20s?
A.  It's going to take a while to count.
Q.  Is there any significance to you as a drug detective or agent about 20s?
A.  They're commonly used in the street, the street deals, smaller venues.
Q.  Did you ever say to Mr. Hilal that you wanted to be paid $28,000 in 20s?
A.  No, ma'am.
Q.  Would hundred dollar bills have worked just as well for you?
A.  Yes, ma'am.

Deputy Thompson testified the gun found in Sumbundu's "front waistband" was loaded.  Deputy Thompson also seized $603 found on Sumbundu.

WSPCL forensic scientist Vanwyk testified he tested both the kilogram of cocaine and the approximately 13 grams of cocaine found in Sumbundu's car.  Vanwyk identified the kilogram "brick . . of powder" as cocaine.  Vanwyk identified the 13 grams of "compressed white powder" as cocaine.

At the close of the State's case-in-chief, defense counsel gave an opening statement.  Defense counsel told the jury Sumbundu was engaged in the business of exporting cars to Gambia, Africa, for sale and purchased the cars with cash.  Defense counsel said that in May 2014, Hilal approached Sumbundu about buying a 2012 Mercedes-Benz for $29,000 and " 'just want[ed] a $500 finder's fee.' " Defense counsel said Sumbundu purchased the "small" amounts of marijuana and cocaine for personal use.

Defense counsel told the jury Sumbundu picked up Hilal on May 20 to drive to the park and ride in Bellingham to purchase the car.  Defense counsel told the jury Sumbundu had a handgun because he had "almost $29,000 in cash and going to a place to meet someone he doesn't know."  Defense counsel said that after Hector

13

asked Sumbundu if he was " 'the money man[,]' . . . [a]ll of the sudden it dawned on Mr.

Sumbundu what was happening." Defense counsel said Sumbundu was "in fear of his

life" and "began to play the role" of a drug dealer:

> Mr. Sumbundu was still in fear of his life, whether he was actually in risk of losing his life or not, he didn't know, but he was certain that this was not right.
>
> He began to play the role of what Mr. Hilal had clearly made him out to be, someone who he was not. But Mr. Sumbundu will explain the reason he went into this detail. He pulled out all the terminology he could think of from the times that he had purchased cocaine from the man in the U[niversity] District.

Defense counsel said after Sumbundu was arrested, he was in "shock" and told

Detective High "things that were not true" because growing up in Gambia caused him to

fear the police:

> After he was arrested the shock of the arrest must have been overwhelming, and Mr. Sumbundu will tell you his mind was racing. He said things that were true; he said things that were not true, things that he thought might protect himself. You'll hear Mr. Sumbundu also talk about the way that people were — the way law enforcement treats people in Gambia is the way that he grew up. He was fearful that something bad was going to happen with law enforcement. He wanted to do and say anything he could to protect himself at the time, based on assurances that if he cooperates he'll still be able to pick up his son from daycare that afternoon.

Sumbundu testified. Sumbundu was born in Gambia. Sumbundu testified that

he bought used cars at auction and shipped them to Gambia for sale. Sumbundu said

he had shipped "15 to 16 or 17" cars to Gambia.

Sumbundu said he met Hilal at Prudent Autodeals. Hilal was a friend of the

owner of Prudent. Sumbundu testified that Hilal told him he knew someone that wanted

to sell a 2012 "Mercedes-Benz CLS" in Bellingham for $29,000. Sumbundu said a

"used" CLS was worth $35,000 to $38,000. Sumbundu testified Hilal did not "mention anything about purchasing cocaine."

Sumbundu testified he and Hilal drove to Bellingham on May 20, 2014 in his Infiniti. When they arrived at the park and ride, "I tried to take a wide turn . . . to see from end to end for the car I'm looking at." Sumbundu did not "see that car there" and because Hilal "immediately before I park, he just jump out from the car," Sumbundu started to get "freaked out." Sumbundu testified that he was scared he was "[g]etting robbed" or "[g]etting killed."

Sumbundu testified he got out of the car because he "was smoking a cigarette" and did not want to "throw the cigarette on the bushes area." Sumbundu testified that Agent Carrasco asked if he was " 'the money man' " and "the guy started bringing question and drugs."

Sumbundu admitted that it was his "voice on the recording." Sumbundu testified that he had never "seen a kilo . . . . Never in my life." Sumbundu said he never "distributed drugs down in the University District." Sumbundu said he does not "know how to make crack cocaine" and never "made crack cocaine."

Sumbundu testified that nothing he said to Agent Carrasco was true. Sumbundu said his "primary goal was to talk my way out" and "get out of there as quick as is possible." Sumbundu testified he had no involvement in the drug transaction on May 20.

Sumbundu testified that he buys marijuana "[m]aybe weekly" from a neighbor. Sumbundu said, "I just buy dime . . . basically trying to get a discount off buying a little bit bulk, something like that." Sumbundu said the 10 marijuana baggies in his car were

for "personal use." Sumbundu testified that he uses cocaine "recreationally" and the 13 grams of cocaine in his car was for "personal use." Sumbundu testified he buys cocaine approximately three times a year from a person he knows in the University District.

Sumbundu admitted he "own[s] a handgun." Sumbundu testified he is married and has a young son, and because he is a "family man," he kept the cocaine, marijuana, and gun in his car. Sumbundu said when he goes to "a new location with a large amount of cash," he is concerned about "getting robbed." Sumbundu testified he has the gun "to protect the cash I be having with me all the time." Sumbundu said that when he got out of his car at the park in ride, he grabbed the gun from under the driver's seat because he was concerned about "[g]etting robbed."

Sumbundu said he told "the police that Hilal gave [him] the gun" because he was "just freaked out and scared about police." Sumbundu did not remember telling Detective High that he "believed Hilal might have been trying to buy marijuana."

On cross-examination, Sumbundu admitted he was "the first person who started talking about drugs, and dealing, and cooking, and selling" because he was "scared and all that." Sumbundu said no one "had said anything about drugs" but he "[a]utomatically" sensed "something is not right there." Sumbundu said he "didn't know crack was made from cocaine." Sumbundu said he "just happened to . . . guess that cocaine was made into crack and it was done by cooking."

Sumbundu testified that he did not tell Detective High the truth, "I was telling him how I can get myself out of there because my son was in the daycare waiting for me to pick him up before 6:00." Sumbundu said his wife could not pick up their son because "[s]he's at work before driving going home. It's late, so I have to pick him up that day."

16

The prosecutor asked Sumbundu whether he called his wife from jail. Sumbundu said, "I call my wife." After questioning Sumbundu about the jail telephone calls, Sumbundu admitted he called only bail bond companies and a "family friend" named "Suzette."

The State called Agent Carrasco and Detective High in rebuttal. Agent Carrasco testified that Sumbundu was "the first person in this conversation to mention cocaine or coke or crack." Detective High testified that making crack requires "[c]ocaine, baking soda, and water in a boiling pot" to "heat up" so the ingredients solidify into "like a wafer or a cracker at the bottom of this pan. And then from that cracker, you crack it up and then you make your little, your little rocks from that wafer."

At the end of the case, the parties addressed the jury instructions. The prosecutor told the court that count 1, possession with intent to deliver, was based on only the kilogram of cocaine:

> I am not intending to argue that the 13 grams in the car was — is the substance of count one. It is the kilo of cocaine. . . . And I'm not going to argue that that 13 grams was possessed for the purpose of — or with the intent to deliver to someone else.

The court decided to give the defense proposed jury instruction on necessity. Jury instruction 19 states:

> Necessity is a defense to a crime if
>      (1)  the defendant reasonably believed the commission of the crime was necessary to avoid or minimize a harm; and
>      (2)  harm sought to be avoided was greater than the harm resulting from a violation of the law; and the
>      (3)  the threatened harm was not brought about by the defendant; and
>      (4)  no reasonable legal alternative existed.
>      The defendant has the burden of proving this defense by a preponderance of the evidence. Preponderance of the evidence means that you must be persuaded, considering all the evidence in the case, that it is more probably true than not true. If you find that the defendant has

17

established this defense, it will be your duty to return a verdict of not guilty [as to this charge].[8]

The jury found Sumbundu guilty as charged of unlawful possession of a kilogram of cocaine with intent to deliver, conspiracy to deliver a controlled substance, and maintaining a vehicle for drug trafficking. By special verdict, the jury found that Sumbundu was "armed with a firearm at the time of the commission of the crime[s]" and that he committed a "major violation of the Uniform Controlled Substance Act." The court found the three convictions constituted the same criminal conduct. The court sentenced Sumbundu to 62 months plus the mandatory 36-month firearm enhancement for a total of 98 months.

## ANALYSIS

Sufficiency of the Evidence: Count 1 and Count 3

Sumbundu seeks dismissal of count 1 and count 3, arguing insufficient evidence supports the jury convictions of possession of cocaine with intent to deliver and maintaining a vehicle for drug trafficking.

The State has the burden to prove every element of the crime charged beyond a reasonable doubt. U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3; In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Winship, 397 U.S. at 364; State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). Sufficiency of the

---

[8] Alteration in original.

18

evidence is a question of constitutional law that we review de novo. Rich, 184 Wn.2d at 903.

Review of a challenge to sufficiency of the evidence is "highly deferential to the jury's decision." State v. Davis, 182 Wn.2d 222, 227, 340 P.3d 820 (2014). In addressing a claim of insufficient evidence, we consider " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " State v. Johnson, 188 Wn.2d 742, 762, 399 P.3d 507 (2017)[9] (quoting State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980)).

A challenge to the sufficiency of the evidence admits the truth of the State's evidence. State v. Witherspoon, 180 Wn.2d 875, 883, 329 P.3d 888 (2014). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). In determining sufficiency, circumstantial evidence is no less reliable than direct evidence. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the trier of fact on "issues of witness credibility." Witherspoon, 180 Wn.2d at 883.

Count 1: Possession with Intent To Deliver

Sumbundu contends the State did not prove possession of the cocaine with the intent to deliver. Possession may be either actual or constructive. State v. Staley, 123

---

[9] Internal quotation marks omitted.

Wn.2d 794, 798, 872 P.2d 502 (1994); State v. Reichert, 158 Wn. App. 374, 390, 242 P.3d 44 (2010). Actual possession means physical custody of the item. Staley, 123 Wn.2d at 798. The State "must prove actual control" that is "more than a passing control" or mere momentary handling. Staley, 123 Wn.2d at 801.

Constructive possession means the defendant does not have actual physical possession but rather dominion and control over the controlled substance. Staley, 123 Wn.2d at 798. Dominion and control need not be exclusive. State v. Weiss, 73 Wn.2d 372, 375, 438 P.2d 610 (1968); State v. George, 146 Wn. App. 906, 920, 193 P.3d 693 (2008). Mere proximity to drugs is insufficient to establish constructive possession. State v. Portrey, 102 Wn. App. 898, 902-03, 10 P.3d 481 (2000).

The court instructed the jury on "actual or constructive" possession and "dominion and control." Jury instruction 14 states:

> Possession means having a substance in one's custody or control. It may be either actual or constructive. Actual possession occurs when the item is in the actual physical custody of the person charged with possession. Constructive possession occurs when there is no actual physical possession but there is dominion and control over the substance.
> Proximity alone without proof of dominion and control is insufficient to establish constructive possession. Dominion and control need not be exclusive to support a finding of constructive possession.
> In deciding whether the defendant had dominion and control over a substance, you are to consider all the relevant circumstances in the case. Factors that you may consider, among others, include whether the defendant had the immediate ability to take actual possession of the substance, whether the defendant had the capacity to exclude others from possession of the substance, and whether the defendant had dominion and control over the premises where the substance was located. No single one of these factors necessarily controls your decision.

Sumbundu cites State v. Jones, 146 Wn.2d 328, 333, 45 P.3d 1062 (2002), to argue insufficient evidence supports the jury finding dominion and control over the cocaine because the State did not prove the cocaine could be "reduced to actual possession immediately." The language Sumbundu relies on is taken out of context. In Jones, the Supreme Court addressed dominion and control over a firearm. The court cited State v. Simonson, 91 Wn. App. 874, 960 P.2d 955 (1998), to state dominion and control "means that the object may be reduced to actual possession." Jones, 146 Wn.2d at 333. In Simonson, the court states that more than dominion and control is needed to find that a person is "armed" with a deadly weapon—there also must be evidence that the deadly weapon is " 'readily available for use,' either offensively or defensively, during the commission of the crime." Simonson, 91 Wn. App. at 882 (quoting State v. Valdobinos, 122 Wn.2d 270, 282, 858 P.2d 199 (1993)).

Outside of the deadly weapon context that requires proof of "readily available for use," our Supreme Court has used a totality of the circumstances test to determine dominion and control. See, e.g., State v. Partin, 88 Wn.2d 899, 906, 567 P.2d 1136 (1977) ("we will look to the totality of the situation to determine . . . dominion and control"),[10] overruled on other grounds by State v. Lyons, 174 Wn.2d 354, 275 P.3d 314 (2012).

Dominion and control over premises "creates a rebuttable presumption that the person has dominion and control over items on the premises." Reichert, 158 Wn. App. at 390. A vehicle is considered a "premises." George, 146 Wn. App. at 920. Therefore, a jury can infer constructive possession of items in the vehicle from a person's dominion

_____

[10] Emphasis in original.

and control over the vehicle.  See State v. Shumaker, 142 Wn. App. 330, 334, 174 P.3d 1214 (2007).

The totality of the circumstances and the evidence and inferences in the light most favorable to the State supports the jury finding that Sumbundu had dominion and control over the kilogram of cocaine the police seized from the trunk of his car.  There is no dispute that Sumbundu owned the Infiniti.  The evidence shows Sumbundu drove his Infiniti to Bellingham with Hilal to purchase a kilogram of cocaine.  Sumbundu told Agent Carrasco he planned to use the kilogram of cocaine to make crack and sell crack cocaine in the University District.  While Hilal went with Agent Carrasco to get the kilogram of cocaine, Sumbundu remained at the car, assembling the $28,000 to pay for the kilogram of cocaine.  When Hilal returned, he put the backpack with the kilogram of cocaine in the trunk of Sumbundu's car.

The State argues the evidence also supports finding Sumbundu acted as an accomplice.  Under RCW 9A.08.020(3)(a), a person can be guilty as an accomplice to another person in the commission of a crime if with knowledge that it will promote or facilitate the commission of the crime, he encourages, aids, or agrees to aid another person in planning or committing the crime.

The court instructed the jury on accomplice liability.  The jury instruction on accomplice liability states:

> A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable.  A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime.
> A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:

(1) solicits, commands, encourages, or requests another person to commit the crime; or

(2) aids or agrees to aid another person in planning or committing the crime.

The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

Here, the jury could reasonably find Sumbundu aided, encouraged, and promoted Hilal in the commission of the crime and was an accomplice involved in the possession of the kilogram of cocaine with the intent to deliver. When considering accomplice liability, whether one or the other of the accomplices "actually possessed" the controlled substance is not dispositive. State v. McPherson, 111 Wn. App. 747, 760, 46 P.3d 284 (2002). The focus is on whether the defendant by his "presence and actions" attempted to facilitate possession with intent to deliver. McPherson, 111 Wn. App. at 760.

Hilal testified at trial that he pleaded guilty to possession of the kilogram of cocaine with intent to deliver. The undisputed evidence shows Sumbundu brought $28,000 in cash with him in his car. When he and Hilal arrived at the park and ride in Bellingham, Sumbundu talked to Agent Carrasco. Sumbundu told Agent Carrasco he was "the money man" and showed him the containers with money in the car. While Sumbundu stayed at the car to put together the money, Hilal went with Agent Carrasco to get the kilogram of cocaine. After Hilal took possession of the backpack with the kilogram of cocaine, he returned to the Infiniti to put the backpack in Sumbundu's car.

23

The case Sumbundu relies on, State v. Morris, 77 Wn. App. 948, 896 P.2d 81 (1995), is distinguishable. In Morris, the court held that "a person who buys drugs does not 'transfer,' and hence does not 'deliver' " under the statute defining possession with intent to deliver, RCW 69.50.401. Morris, 77 Wn. App. at 950-51. The court concluded that a buyer in a two-person transaction was not an accomplice to the seller of drugs because the legislature "defined the crime as 'delivery' or 'transfer' and it would frustrate that definition to impose liability on the transferee through the accomplice statute." Morris, 77 Wn. App. at 954-55. Here, unlike in Morris, the evidence established a three-person transaction between Agent Carrasco, Hilal, and Sumbundu.

The other case Sumbundu cites for the first time in his reply brief, United States v. Edwards, 166 F.3d 1362 (11th Cir. 1999), is also distinguishable. In Edwards, the court held the defendant did not have constructive possession of cocaine located in the locked trunk of an undercover agent's car because the defendant did not have access to the trunk. Edwards, 166 F.3d at 1364.

We conclude sufficient evidence supports the jury finding Sumbundu guilty of possession of a kilogram of cocaine with intent to deliver.

Count 3: Maintaining a Vehicle for Drug Delivery

Sumbundu contends insufficient evidence supports the jury finding him guilty of maintaining a vehicle for drug trafficking in violation of RCW 69.50.402(1)(f). RCW 69.50.402(1)(f) states it is unlawful for any person to knowingly keep or maintain any vehicle "which is used for keeping or selling" controlled substances "in violation of this chapter."

24

Sumbundu cites State v. Ceglowski, 103 Wn. App. 346, 12 P.3d 160 (2000), to argue insufficient evidence supports the conviction. In Ceglowski, we held that to convict Sumbundu of maintaining a vehicle for drug trafficking, "there must be: (1) some evidence that the drug activity is of a continuing and recurring character; and (2) that a substantial purpose of maintaining the premises is for the illegal drug activity." Ceglowski, 103 Wn. App. at 352-53. However,

> [t]his rule does not mean that a small quantity of drugs or evidence found on only "a single occasion cannot be sufficient to show a crime of a continuing nature." The evidence could be sufficient if the totality of the evidence proves that the defendant "maintained" the premises for selling or keeping controlled substances.

Ceglowski, 103 Wn. App. at 353 (quoting Barnes v. State, 255 Ga. 396, 402, 339 S.E.2d 229 (1986)).

Here, unlike in Ceglowski, the kilogram of cocaine was a large quantity and Sumbundu was convicted of possession with intent to deliver or manufacture, not mere possession. The evidence showed Sumbundu owned the vehicle and was in possession of the vehicle when Hilal put the kilogram of cocaine in the open trunk of Sumbundu's Infiniti. Although this was a single transaction with an undercover agent, the evidence showed Sumbundu engaged in drug activities that were continuing and recurring in nature. Sumbundu asked Agent Carrasco about supplying additional kilograms of cocaine in the next few weeks and told Agent Carrasco he planned to use the kilogram to make and sell crack cocaine. The evidence supports the jury conviction of maintaining a vehicle for drug trafficking.

Count 2: Conspiracy To Deliver a Controlled Substance

Sumbundu seeks reversal and a new trial of his conviction of conspiracy to deliver cocaine. For the first time on appeal, Sumbundu contends the to-convict jury instruction misstates the law.

As a general rule, a defendant cannot challenge a jury instruction for the first time on appeal without showing that he took exception to that instruction below. State v. Salas, 127 Wn.2d 173, 181-82, 897 P.2d 1246 (1995). But instructing the jury in a manner that relieves the State of its burden of proof is an error of constitutional magnitude that a defendant can raise for the first time on appeal. State v. Byrd, 125 Wn.2d 707, 714, 887 P.2d 396 (1995); RAP 2.5(a)(3).

We review the adequacy of a "to convict" jury instruction de novo. State v. Mills, 154 Wn.2d 1, 7, 109 P.3d 415 (2005). Here, the to-convict jury instruction for the crime of conspiracy to deliver a controlled substance states, in pertinent part, "That on or about the 20th day of May, 2014, the defendant agreed with one or more persons to engage in or cause the performance of conduct constituting the crime of Conspiracy to Deliver a Controlled Substance, to-wit: Cocaine."

Sumbundu cites State v. Smith, 131 Wn.2d 258, 930 P.2d 917 (1997), to contend the to-convict jury instruction misstates the law and erroneously allowed the jury to find he conspired to deliver a controlled substance. In Smith, the to-convict instruction required the jury to find beyond a reasonable doubt that the defendant agreed to " 'engage in . . . the performance of conduct constituting the crime of Conspiracy to

Commit Murder in the First Degree.' " Smith, 131 Wn.2d at 260-61.[11] The Washington Supreme Court held the to-convict instruction was "constitutionally defective because it purports to be a complete statement of the law yet states the wrong crime as the underlying crime which the conspirators agreed to carry out." Smith, 131 Wn.2d at 263.

Here, the State concedes the to-convict jury instruction misstates the law. We reject the State's argument that the error is harmless. The court in Smith considered and rejected the same argument and held the to-convict instruction

> structured the jury's deliberations by purporting to set forth the elements of the crime. We can only assume that the jury relied upon the "to convict" instruction as a correct statement of the law. The jury was not required to search the other instructions to make sense of the erroneous "to convict" instruction, and we cannot assume that the jury attempted to compensate for the court's error by doing so. We, therefore, cannot say that the error was harmless.

Smith, 131 Wn.2d at 265; see also State v. Miller, 131 Wn.2d 78, 90-91, 929 P.2d 372 (1997) ("The conspiracy instruction, . . . by not including the element of delivery to a third person, was erroneous and cannot be considered harmless because it affected the right of Petitioner to have the jury base its decision on an accurate statement of the law.").

Because the to-convict instruction erroneously allowed the jury to convict Sumbundu of the crime of conspiracy to deliver a controlled substance, we reverse and remand for a new trial on count 2.

Denial of Motion for Mistrial

Sumbundu seeks reversal of his convictions, arguing the court erred in denying his motion for mistrial because the prosecutor violated CrR 4.7 by not disclosing jail

---

[11] Emphasis in original; alteration in original.

telephone calls used to impeach Sumbundu during cross-examination.

CrR 4.7(a)(1)(ii) requires the prosecutor to disclose "any written or recorded statements and the substance of any oral statements made by the defendant." CrR 4.7(a)(2)(i) requires the prosecutor to disclose "any electronic surveillance, including wiretapping, of the defendant's premises or conversations to which the defendant was a party and any record thereof." The State has a continuing duty to disclose under CrR 4.7(h)(2). The State must produce evidence that it intends to use for impeachment or rebuttal purposes to the defense. State v. Dunivin, 65 Wn. App. 728, 734, 829 P.2d 799 (1992).

We review a trial court's denial of a motion for mistrial for abuse of discretion. State v. Grieff, 141 Wn.2d 910, 921, 10 P.3d 390 (2000). A trial court abuses its discretion when its decision is manifestly unreasonable, based on untenable grounds, or made for untenable reasons. State v. Barry, 184 Wn. App. 790, 797, 339 P.3d 200 (2014). A trial court's denial of a motion for mistrial "will be overturned only when there is a 'substantial likelihood' the prejudice affected the jury's verdict." State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994).

Granting a mistrial is an "extraordinary remedy." State v. Cannon, 130 Wn.2d 313, 328, 922 P.2d 1293 (1996). The general approach to discovery violations is "to impose the least severe sanction that adequately addresses the prejudice." State v. Salgado-Mendoza, 189 Wn.2d 420, 431, 403 P.3d 45 (2017).[12]

---

[12] CrR 4.7(h)(7)(i) sets forth the remedies for discovery violations:
[I]f at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, dismiss the action or enter such other order as it deems just under the circumstances.

28

Sumbundu asserted the affirmative defense of necessity for the first time at the beginning of the trial. During direct examination, Sumbundu testified that he lied to the police because he was scared and he just wanted to "get out of there to go pick [up] my son." On cross-examination, Sumbundu testified that he lied to Detective High because he needed to "get myself out of there because my son was in the daycare waiting for me to pick him up before 6:00." Sumbundu testified that his wife was "at work" and "I have to pick him up that day," but if he was not "going to make it," she "can go pick him up."

On cross-examination, the prosecutor asked Sumbundu whether he called his wife that night "[w]hen you went to jail." Sumbundu said he did.

Q:    You called your wife?
A:    Yes.
Q     You sure?
A.    Yes. Because the jail, they had a free call they give you on your name tag, so you can call anybody.

The prosecutor then asked Sumbundu about calls he made from jail:

Q.    Okay. So you made about nine jail calls when you were in jail; do you remember that?
A.    I don't remember exactly how many calls I make.
Q.    Of those nine, none of those were to your wife, right Mr. Sumbundu?
A.    I call my wife.
Q.    Did you tell her you were in jail?
A.    Yeah. I tell her I'm in jail.
Q.    Did you tell her how you were in jail?
A.    I don't have to go in details just to briefly letting her know I've been arrested. I cannot go pick [up] the kid, so can you just go pick [up] the kid.
Q.    Okay. So who else did you call from jail?
A.    Friends can help me out to take me out on the situation I am.
    . . . .
Q.    Well, you only called one person from jail, correct? Your girlfriend.
A.    I call my wife when I was in jail.
Q.    Did you call your girlfriend?

A.    I called friends just to let them know what's ever going on.
Q.    Of nine calls, six were to a woman, was that woman your wife?
A.    Yes. She's my wife.
Q.    All six?
        Okay. Why did that woman ask you "have you called your wife yet" on one of the jail calls, Mr. Sumbundu? Your answer was —
A.    I called my wife; I called my family friend.
Q.    Mr. Sumbundu.
A.    Which are so close to me.
Q.    Your answer was no. You know the jail calls are recorded?
A.    Yes.
Q.    Okay. So —.

Defense counsel objected to these questions on the grounds that the prosecutor had not disclosed the jail telephone calls, "Your Honor, I'd object to this line of questioning without, the calls haven't been disclosed." Defense counsel agreed the prosecutor "can ask questions" about the jail calls "but she can't testify."[13] Defense counsel stated, "And so I'd object to the form of the question, ask the jury to disregard the question, and then we'll see if there's any other objectionable questions." The court sustained the defense objection and directed the jury "to disregard any statements made by [the prosecutor] about what the calls do or do not consist of" but allowed the prosecutor to "ask questions."

The prosecutor then asked Sumbundu, "[W]ho was the woman that you called?"

A.    It's a family friend. She's a family friend, I call.
Q.    And do you remember during one of the calls to your family friend —
        [DEFENSE COUNSEL]: Objection, Your Honor, same basis.

The court overruled the objection, stating, "I think she can ask the question in that form."

---

[13] A defendant must assert violation of the right to confrontation at trial or the right is waived. State v. Burns, 193 Wn.2d 190, 206-07, 438 P.3d 1183 (2019); accord Melendez-Diaz v. Massachusetts, 557 U.S. 305, 311, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009). We conclude defense counsel sufficiently preserved the right to confrontation claim. The constitutional ground is apparent from his objection.

The prosecutor then asked:

Q.   Do you remember a call to your family friend where your family friend asked you, did you call your wife yet?
A.   I don't remember, but I remember them calling and all that to a family friend and friends because those are the only number I cram in my head.
Q.   But you only called one person that would be a family friend, right? This woman.
A.   No. I don't call one person.
Q.   Well, you called three bail bond companies or actually two bail bond companies —
     THE COURT:   Questions, please.

Defense counsel objected to "more testimony." The court directed the prosecutor to ask

only "questions, please."

Without objection, in response to further questioning, Sumbundu admitted he

called bail bond companies and made six calls to family friend "Suzette."

Q.   Do you remember calling bail bond companies?
A.   Yes. Because never been locked down, never been in jail, so I was scared. I was trying anyway how I can get myself out of there.
Q.   You called Lacy O'Malley twice; is that correct?
A.   Finding a way of how to get bail or anything.
Q.   No. I understand. I'm just asking you, you called them?
A.   Yes, yes.
Q.   And you called another bail bond company here in Bellingham locally once?
A.   That's number full of a list paper by the telephone booth you're making the call at. So I'm scared, and I'm freaked out. I'm in the jail. I never experienced jail, so I have to find any single way how to get out of there.
Q.   The rest of the calls, the other six, were to one — the same person; is that correct?
A.   Yes. Suzette.

At the conclusion of the testimony, defense counsel moved for a mistrial on the

grounds that the prosecutor "never disclosed" Sumbundu's jail telephone calls in

31

violation of CrR 4.7.

> I was very troubled that the State as part of its cross-examination of Mr. Sumbundu brought up jail phone calls. . . . That apparently were done to discredit Mr. Sumbundu's claims that he's a family [man] or not calling his wife, but certainly was used to impeach Mr. Sumbundu's credibility. I've never received any jail phone calls at all. If these were phone calls that were brought up in the State's rebuttal, I think I would have maybe less of an objection — well, I probably wouldn't have less of an objection, but I wouldn't be so concerned about it. Four point seven's very very specific that if the State has possession of recordings of the defendant, those need to be disclosed. Those were never disclosed. Not before omnibus, not before the first day of trial, not until cross-examination of Mr. Sumbundu, and I'm very very troubled by that. And I'm not thinking [the prosecutor] was doing this intentionally to gain an unnecessary advantage, but it certainly has had that effect. And I'm very concerned that her failure to disclose under 4.7 that she's apparently had for quite some time that was used during cross-examination to impeach Mr. Sumbundu is very troubling.
>
> I was contemplating over the lunch — I did object to it at the time, I didn't want to bring up . . . potential curative solutions in front of the jury, but certainly, those remedies range all the way from declaring a mistrial to asking the Court for a curative instruction.
>
> I'm not sure how a curative instruction advising the jury not to consider the nature of the jail phone calls, or the content of them, or the number of them, or who they were made to would be effective. Especially because a lot of the questioning was essentially testifying to information that was not in evidence through a witness. I think it's only appropriate that the defense makes a motion for a mistrial at that point based on the failure of the State to disclose those recordings.
>
> But more problematically due to the State using those recordings as impeachment against the defendant during cross-examination.

The court ruled the prosecutor violated CrR 4.7 by not disclosing the jail calls before cross-examination of Sumbundu. But the court ruled the prosecutor was entitled to cross-examine Sumbundu about his testimony that he contacted his wife to pick up his son and noted it had instructed the jury to disregard all statements related to the content of the jail calls. The court denied the motion for mistrial.

Defense counsel then requested the court instruct the jury "not to consider the content of those phone calls for any purpose." The court denied the request.

Sumbundu contends the court erred by not granting the motion for mistrial or giving the defense proposed curative instruction.

The court expressly instructed the jury to "disregard any statements by [the prosecutor] about what the calls do or do not consist of." Sumbundu argues the court's instruction was insufficient because it was vague and did not specifically strike the reference to Suzette being a "girlfriend." But the curative instruction was not vague and adequately addressed any prejudice. We presume the jury follows the court's instructions. State v. Lamar, 180 Wn.2d 576, 586, 327 P.3d 46 (2014).

In denying the motion for mistrial and the request to give the defense curative instruction, the court ruled, "[T]he jury was instructed by the Court not to consider [the prosecutor's statements], I think I've already told them not to do that. So, I think that that's as far — I'd rather not call further attention to it, frankly, so I am denying the motion." We conclude the court did not abuse its discretion by denying the motion for mistrial and declining to give the defense curative instruction.

In the alternative, Sumbundu contends the prosecutor violated his right to confrontation by not admitting the jail telephone calls into evidence.[14]

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution give criminal defendants the right to confront and cross-examine adverse witnesses. State v. Hudlow, 99 Wn.2d 1, 14-15, 659 P.2d 514 (1983). A constitutional confrontation clause error is harmless if we are convinced "any reasonable jury would have reached the same result in the absence of the error." State v. Holzknecht, 157 Wn. App. 754, 760, 238 P.3d 1233 (2010).

---

[14] As previously noted, Sumbundu preserved the right to raise his confrontation claim.

"A prosecutor's impeachment of a witness by referring to extrinsic evidence that is never introduced may violate a defendant's right to confrontation." State v. Miles, 139 Wn. App. 879, 886, 162 P.3d 1169 (2007) (citing State v. Babich, 68 Wn. App. 438, 445-46, 842 P.2d 1053 (1993)). "A prosecutor may not use impeachment as a means of submitting evidence to the jury that is otherwise unavailable." Miles, 139 Wn. App. at 886. If the witness denies the prior statement, "extrinsic evidence of the statement is admissible unless it concerns a collateral matter." Babich, 68 Wn. App. at 443. "If the witness admits the prior statement, extrinsic evidence of the statement is not allowed because such evidence 'would waste time and would be of little additional value.' " Babich, 68 Wn. App. at 443 (quoting 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 258(2), at 315 (3d ed. 1989)).

Because the record shows Sumbundu admitted that of the nine calls he made from jail, three were to bail bond companies and six were to "family friend" Suzette, we conclude Sumbundu cannot show violation of his right to confrontation. Further, even if error, any reasonable jury would have reached the same result in the absence of the error.

Prosecutorial Misconduct

For the first time on appeal, Sumbundu contends the prosecutor committed misconduct by (1) violating his constitutional right to remain silent, (2) asking about privileged communications with his attorney, and (3) presenting evidence that the police did not have probable cause to obtain a warrant to search Sumbundu's house.

RAP 2.5(a)(3) permits an appellate court to review an unpreserved claim of error only if it involves a "manifest error affecting a constitutional right." The alleged error

34

must be "truly of a constitutional magnitude" and "manifest" in the record. State v. Kalebaugh, 183 Wn.2d 578, 583, 355 P.3d 253 (2015).

To prevail on a claim of prosecutorial misconduct, a defendant must show the prosecutor's conduct was both improper and prejudicial. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012); State v. Lindsay, 180 Wn.2d 423, 430-31, 326 P.3d 125 (2014). Where the defendant does not object at trial, any error is waived unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). Under this heightened standard, the defendant must show that (1) "no curative instruction would have obviated any prejudicial effect on the jury" and (2) the misconduct resulted in prejudice that "had a substantial likelihood of affecting the jury verdict." State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011).

## 1. Right to Remain Silent

Sumbundu contends the prosecutor violated his Fifth Amendment to the United States Constitution right to remain silent.[15] Whether the questions violated Sumbundu's constitutional right to remain silent is a manifest error affecting a constitutional right that he can raise for the first time on appeal. State v. Romero, 113 Wn. App. 779, 786, 54 P.3d 1255 (2002).

---

[15] The Fifth Amendment states, in part, that no person "shall be compelled in any criminal case to be a witness against himself." This provision applies to states through the Fourteenth Amendment to the United States Constitution. See Malloy v. Hogan, 378 U.S. 1, 10-11, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). Article I, section 9 of the Washington Constitution states, in pertinent part, "No person shall be compelled in any criminal case to give evidence against himself."

The State may not comment on the exercise of a defendant's right to remain silent. State v. Easter, 130 Wn.2d 228, 243, 922 P.2d 1285 (1996). A comment on a defendant's silence occurs when the State uses a defendant's constitutionally permitted silence for the State's advantage, either as substantive evidence of guilt or to suggest that the silence was an admission of guilt. State v. Lewis, 130 Wn.2d 700, 707, 927 P.2d 235 (1996). It is impermissible for a police witness to comment on the defendant's silence so as to infer guilt from a refusal to answer questions. Lewis, 130 Wn.2d at 705.

Sumbundu claims the prosecutor violated his right to remain silent by asking Deputy Thompson whether he asked Sumbundu any questions while transporting him to the jail.

Deputy Thompson read Sumbundu his Miranda rights before Detective High interviewed him. Deputy Thompson testified that after Detective High interviewed Sumbundu, "I took custody of Mr. Sumbundu again and transported him to the Whatcom County Jail where I booked him in." Deputy Thompson testified that he did not "have any conversation" with Sumbundu:

> Q.    Okay. And did you have any conversation with Mr. Sumbundu after you came and got him?
> A.    No.
> Q.    Or even prior to that?
> A.    No.

Deputy Thompson's testimony that he did not have "any conversation with Mr. Sumbundu" while transporting Sumbundu to the jail does not suggest a refusal to talk or an admission of guilt. Because the testimony is not a comment on the defendant's silence, we conclude the questions did not violate Sumbundu's constitutional right to remain silent.

## 2. Attorney-Client Communications

Sumbundu contends the prosecutor violated his constitutional rights by asking him about confidential communications with his attorney. The Sixth Amendment right to counsel includes the right to confer privately with that counsel. State v. Peña Fuentes, 179 Wn.2d 808, 811, 318 P.3d 257 (2014). State intrusion into those privileged attorney-client communications is "a blatant violation" of the Sixth Amendment. Peña Fuentes, 179 Wn.2d at 811; State v. Irby, 3 Wn. App. 2d 247, 254, 415 P.3d 611 (2018). "To qualify for attorney-client privilege, a communication must be made in confidence." Morgan v. City of Fed. Way, 166 Wn.2d 747, 757, 213 P.3d 596 (2009).

During cross-examination of Hilal, defense counsel asked if he recalled "discussing with Mr. Sumbundu a 2010 Mercedes sedan." Hilal testified he did not "recall a conversation like that." Sumbundu testified that Hilal told him about a "2012" "Mercedes Benz CLS 550" for sale.

On cross-examination of Sumbundu, the prosecutor asked whether he recalled his attorney's reference to a 2010, not 2012, Mercedes-Benz:

> Q.    Do you remember your attorney asked [Hilal] a question about did he ever have a conversation or discuss with you a 2010 Mercedes sedan; do you remember that?
> A.    I remember.

The prosecutor then asked whether Sumbundu said anything to his attorney about the year of the Mercedes-Benz:

> Q.    Okay. Did you say anything to your attorney about that "Hey, that wasn't a 2010, it was a 2012 CLS 550"?
> A.    Well, I already tell — I tell that to my lawyer after. I just don't want to interrupt his cross-examine or anything. I don't feel like I — as I said, I don't know any[ ]how court issues go. Just being in it and then I'm trying to basically see whatever going on.

Q. Did you tell your lawyer the car originally was a 2010 Mercedes-Benz CLS?
A. I tell him 2010 way before the incident happen.
Q. You did tell him that?
A. Mm-hmm.
Q. Well, why would you tell him that? You just rattled off every —
A. Just to know the side of my story, I have to explain it to my lawyer to understand.
Q. But it wasn't a 2010.
A. I never tell him 2010; I tell him 2012.

Sumbundu's attorney did not object. We conclude the prosecutor's questions impermissibly infringed on Sumbundu's Sixth Amendment constitutional attorney-client privilege but the error was not manifest.

Where, as here, the prosecutor intrudes on privileged attorney-client communications, there is a presumption of prejudice. Peña Fuentes, 179 Wn.2d at 819. However, the presumption is rebuttable where the State shows "beyond a reasonable doubt that the defendant was not prejudiced." Peña Fuentes, 179 Wn.2d at 819-20. We conclude beyond a reasonable doubt that Sumbundu was not prejudiced. The questioning was limited and Sumbundu consistently testified that he told his attorney the Mercedes-Benz was a 2012 model.

Peña Fuentes and Irby are distinguishable. In Peña Fuentes, a detective listened to the defendant's telephone calls, "including six conversations between Peña Fuentes and his attorney." Peña Fuentes, 179 Wn.2d at 817. The Supreme Court remanded for an evidentiary hearing and additional discovery to determine whether Peña Fuentes was prejudiced by the government misconduct. Peña Fuentes, 179 Wn.2d at 821-22. In Irby, jail officers "violated Irby's right to counsel by opening and reading privileged attorney-client communications." Irby, 3 Wn. App. 2d at 251. The trial court denied the motion to dismiss because Irby did not "establish prejudice from

38

the actions of jail security." Irby, 3 Wn. App. 2d at 251, 257. We reversed and remanded for a hearing on whether the misconduct prejudiced Irby. Irby, 3 Wn. App. 2d at 263. In specific:

> [W]hether those investigators had, unbeknownst to the lead detective and prosecutor, obtained information derived from the jail deputies' misconduct, used that information in their investigation of Irby, and/or forwarded those investigative materials to the lead detective or to the prosecutors.

Irby, 3 Wn. App. 2d at 262.[16]

### 3. Search Warrant

For the first time on appeal, Sumbundu claims the prosecutor violated his constitutional right to a fair trial during the trial and closing argument by presenting a "false narrative that the police could not obtain a warrant to search" his house. The premise of the argument is that Whatcom County Detective High could have obtained a federal warrant. The testimony at trial does not support his argument.

On cross-examination, defense counsel asked Detective High whether there was "any attempt to search any of Mr. Sumbundu's property, premises, vehicles, or anything else other than the vehicle that he was arrested in." Detective High answered, "I had no probable cause to do any of that, so no."

On redirect, the prosecutor asked Detective High about "probable cause to search someone's house." Detective High testified that "probable cause would be a connection of Mr. Sumbundu's house to some criminal act." Detective High said he did

---

[16] In the alternative, Sumbundu contends his attorney provided ineffective assistance of counsel by not objecting to evidence of "post-arrest silence" or questions that infringed on his attorney-client privilege. Because Sumbundu cannot show prejudice, his ineffective assistance claim fails. State v. Grier, 171 Wn.2d 17, 32-34, 246 P.3d 1260 (2011).

not "recall having any nexus to his house" because "the crime took place in Whatcom County." Detective High testified that Sumbundu "didn't give [me] a nexus to his house . . . [or] to search anything else belonging to Mr. Sumbundu."

Sumbundu concedes that under Washington law, Detective High could not "search the house of someone arrested on the street for a drug offense without probable cause that there are drugs at the house." But Sumbundu contends that because under federal law "there need only be a 'reasonable nexus' between the activities supporting probable cause and the location to be searched," a federal agent could have obtained a warrant to search his house.

The undisputed testimony established the investigation was "turned over to the Whatcom County Drug Task Force" and was no longer a "federal case." Although there were federal agents who assisted in the investigation and arrest, the Whatcom Gang and Drug Task Force was in charge of the investigation. The uncontroverted testimony of Sumbundu establishes he kept drugs in his car only, not in his house.

Sumbundu also contends for the first time on appeal that the prosecutor committed misconduct in rebuttal closing argument by presenting evidence and argument about why the police did not have probable cause to obtain a warrant to search his house. We disagree.

In closing argument, defense counsel argued:

> The State offered nothing to confirm that Mr. Sumbundu was involved in anything to do with the drug trade, other than this particular incident. There's nothing that — they never executed a search warrant, or never attempted to search any of his property. . . . [T]hey never searched his house because there is no evidence that Mr. Sumbundu was involved in anything related to the drug trade.

In rebuttal, the prosecutor acknowledged that there was nothing in the vehicle "to indicate . . . that the defendant was cooking cocaine, we just have the defendant's words to indicate that." Without objection, the prosecutor responded to defense counsel's argument that Detective High did not search Sumbundu's house:

> Then [defense counsel] argued to you; they didn't search those things, why didn't they? Completely forgetting Detective High's answer, he said, "I didn't have probable cause" so when I asked him "what does that" you have to have a reason. If law enforcement is going to go search your house, they just can't pick on someone and go, "I'm searching your house today." You have to have probable cause. There has to be a connection between the crime you're investigating and the place you're going to go search before you invade someone's personal privacy, personal property.
> They didn't have a connection with Mr. Sumbundu and any place he might be living or any cars he would own. They didn't have a connection that those places or cars would be linked up to him buying this kilo of cocaine. So they can't go search something without probable cause.

The prosecutor is entitled in rebuttal to make a fair response to the defense closing argument. Russell, 125 Wn.2d at 87. Here, the prosecutor's remarks during rebuttal argument about the search warrant were in fair response to the defense closing argument.[17]

Judgment and Sentence

Sumbundu contends the judgment and sentence erroneously states the maximum sentence for maintaining a vehicle for drug trafficking is five years in prison and a $10,000 fine. The State concedes that the maximum sentence is two years in prison and a $2,000 fine. We accept the concession and remand to correct the judgment and sentence.

---

[17] Because there was overwhelming evidence of guilt, we also conclude cumulative error did not deprive Sumbundu of a fair trial.

41

We affirm the jury convictions of possession of a kilogram of cocaine with intent to deliver, count 1; and maintaining a vehicle for drug trafficking, count 3. We reverse the jury conviction for conspiracy to distribute a controlled substance, count 2, and remand for a new trial. On remand, the court shall correct the judgment and sentence.

WE CONCUR: